**TOWN OF NORFOLK, Plaintiff,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and the Massachusetts Water Resources Authority, Defendants.**

**TOWN OF WALPOLE, Plaintiff,**

v.

**William REILLY, in his official capacity as Administrator of the United States Environmental Protection Agency, and the Massachusetts Water Resources Authority, Defendants.**

**Civ. A. Nos. 90–11086–MA, 90–11286–MA.**

United States District Court, D. Massachusetts.

April 5, 1991.

See also, 134 F.R.D. 20.

Stephen Daniel Anderson, Arthur Paul Kreiger, Anderson & Kreiger, Boston, Mass., Christopher Little, Judith C. Kapuscinski, Tillinghast, Collins & Grahams, Providence, R.I., for Town of Norfolk.

George B. Henderson, II, Asst. U.S. Atty., Boston, Mass., for U.S. E.P.A.

Madelyn N. Morris, Mass. Dept. of Atty. Gen., Steven H. Goldberg, Mass. Water Res. Authority, Kathleen A. Scruton, Boston, Mass., for Massachusetts Water Resources Authority.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

In September, 1985, this court entered a finding of liability against the Metropolitan District Commission of Massachusetts and its successor agency, the Massachusetts Water Resources Authority ("MWRA"), for polluting Boston Harbor with untreated sewage from the greater metropolitan Boston area in violation of the Water Pollution Control Act, 33 U.S.C. §§ 1251–1377. *United States v. Metropolitan Dist. Comm'n*, 23 Env't Rep.Cas. (BNA) 1350, 16 Envtl.L.Rep. (Envtl.L.Inst.) 20621, (D.Mass. Sept. 5, 1985). After the finding of liability, MWRA began cooperating with the United States Environmental Protection Agency ("EPA") in planning and orga-

nizing the construction of a new $6 billion sewage treatment system necessary to comply with federal law. This court has overseen and continues to oversee the parties' progress in completing this project. MWRA has filed monthly compliance reports, and this court has entered corresponding compliance orders based on those reports, since November, 1985.

On the basis of my involvement in the Boston Harbor case, the two instant actions were assigned to me as "related civil cases" pursuant to Local Rule 40.1(e). The cases were subsequently consolidated. In them, the Towns of Walpole and Norfolk, Massachusetts ("the Towns"), challenge the adequacy of EPA's Supplemental Environmental Impact Statement for Long–Term Residuals Management for Metropolitan Boston (the "EIS") under the National Environmental Protection Act (NEPA), 42 U.S.C. §§ 4321–4347. The reason for the Towns' challenge is that one component of the proposed residuals management program is the construction of a residuals landfill at a site adjacent to the Massachusetts Correctional Institute at Cedar Junction in Walpole, near the Town of Norfolk (the "Walpole site"). The injury is made all the more acute by the fact that the Towns are outside of the area serviced by MWRA. The Towns seek an adjudication that the EIS does not comply with NEPA and the regulations promulgated thereunder, a remand to EPA to reconsider the landfill siting decision and to revise the EIS, and an injunction to prevent MWRA from taking any further action regarding the Walpole site. The cases are before me now on the defendants' motion for summary judgment.

I

A brief summary of the Boston Harbor clean-up project is necessary to place the present litigation in context. According to present plans, sewage from MWRA's member communities will continue to be processed at Deer Island in Winthrop, where new primary and secondary sewage treatment plants will be built. Treated liquid effluent will be pumped from Deer Island out approximately nine miles by underwater tunnel to a point in Massachusetts Bay. The solid portion of the sewage will be separated into two primary components: (1) grit and screenings and (2) sludge. The sludge will be piped by underwater tunnel from Deer Island to the Fore River Staging Facility in Quincy, where MWRA is constructing a residuals management facility. At this facility, the sludge will be processed into pelletized form. MWRA's residuals management plan calls for market distribution of the pellets as commercial fertilizer. The grit and screenings will be transferred to a landfill to be constructed at the Walpole site. In the event MWRA is unable to market or otherwise legally dispose of the pelletized sludge, it will be deposited in the landfill as well.

MWRA's proposed residuals management program was required to undergo environmental review at both the state and federal levels. MWRA and EPA worked together in the environmental review process; EPA describes its EIS as a "piggy-back" document, building on MWRA's reports. MWRA issued its state-mandated Draft Environmental Impact Report (the "DEIR") in February, 1989. In May, 1989, EPA published its Draft Supplemental Environmental Impact Statement (the "DSEIS"), as required by NEPA.[1] Following the formal public comment period, MWRA's Final Environmental Impact Report (the "FEIR") and EPA's Final Supplemental Environmental Impact Statement (the "FSEIS") were issued in August and November of 1989, respectively.

On November 20, 1989, the Massachusetts Secretary of the Executive Office of Environmental Affairs issued a certificate accepting MWRA's FEIR, which designated the Walpole site as the preferred site for a residuals landfill. In January, 1990, the Towns of Norfolk and Walpole filed actions in state court challenging the state environmental review process. These cases have

---

1. This EIS is denominated as "supplemental" because it supplements the EPA's final EIS for the Deer Island wastewater treatment plant, in which alternatives for disposal of the residuals from the wastewater treatment process were not discussed. DSEIS § 1.1.

been joined and are pending in Suffolk County Superior Court. On March 30, 1990, after additional public comment, EPA issued its Record of Decision (the "ROD") accepting MWRA's long-term residuals management plan, including selection of the Walpole site. Soon thereafter, the Towns filed the instant suits.

## II

The proper scope of judicial review of NEPA cases is well established. The Supreme Court, in a recent NEPA case, described the purpose of NEPA as follows:

> The sweeping policy goals ... of NEPA are ... "realized through a set of 'action-forcing' procedures that require that agencies take a ' "hard look" at environmental consequences,' and that provide for broad dissemination of relevant environmental information. Although these procedures are almost certain to affect the agency's substantive decision, it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process. If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs."

*Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 1846, 104 L.Ed.2d 351 (1989) (citations omitted). Similarly, the First Circuit has stated,

> NEPA is not designed to prevent all possible harm to the environment; it foresees that decisionmakers may choose to inflict such harm, for perfectly good reasons. Rather, NEPA is designed to influence the decisionmaking process; its aim is to make government officials notice environmental considerations and take them into account.

*Commonwealth of Massachusetts v. Watt,* 716 F.2d 946, 952 (1st Cir.1983). *See also Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068, 1072 (1st Cir.1980) ("This substantive review ... is quite narrow in scope. The court should only assure itself

that the agency has given good faith consideration to the environmental consequences of its actions and should not pass judgment on the balance struck by the agency among competing concerns."). Thus it is clear that the reviewing court's function is not to second-guess the choices made by government officials, but rather to assess their process of arriving at those choices.

■ The court's review of an agency decision under NEPA encompasses two aspects. First, the court must conduct a substantive review of the agency's action under the Administrative Procedure Act (APA), 5 U.S.C. § 706, "to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97–98, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983). *Accord Grazing Fields Farm,* 626 F.2d at 1072.

Second, "a reviewing court must assess the agency's compliance with the duties NEPA places upon it." *Id.* Expanding on the content of this review, the First Circuit has stated,

> In a typical case, a reviewing court, in answering this legal question, looks first and foremost at the record before the agency. That is because one cannot ordinarily expect an agency to do more than make reasonable efforts to gather relevant information and then to evaluate that information in light of the comments interested parties have made. The relevant legal question therefore is normally whether the Statement is "adequate" in light of the information and comments before the agency at the time it produced the Statement.

*Valley Citizens for a Safe Environment v. Aldridge,* 886 F.2d 458, 460 (1st Cir.1989) (citations omitted).

Summary judgment is issued when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). In a NEPA case, "summary judgment ... [is] appropriate unless [plain-

tiffs] raised a genuine issue of material fact as to whether [the agency's] substantive decision was arbitrary and capricious or an abuse of discretion." *Concerned Citizens on I–190 v. Secretary of Transp.*, 641 F.2d 1, 7 (1st Cir.1981).

The Towns' and EPA's submissions in connection with this motion present a variety of issues and "factual claims that diverge so widely that one is tempted to think some 'material' factual issue must be in dispute." *Aldridge*, 886 F.2d at 460. In reviewing this motion, I have closely read the briefs and have endeavored "to track those divergent claims to their sources in the record." *Id.* Furthermore, I am mindful of the fact that the Towns, understandably, have subjected the EIS to intense scrutiny, and "of the tendency of such searching scrutiny to magnify retrospectively any possible defect." *Concerned Citizens on I–190*, 641 F.2d at 5.

Having thus surveyed the lay of the legal landscape for this aspect of the Boston Harbor clean-up project, I now proceed to the task before me.

### III

One collateral matter must be resolved before I can address the merits of the summary judgment motion. At the early stages of this litigation, EPA sought a protective order prohibiting all discovery beyond the administrative record compiled in the NEPA process. On August 31, 1990, I allowed the protective order "to the extent that discovery is deferred until a ruling on proposed motions for summary judgment is issued, at which time I will be in a better position to determine if the administrative record is adequate, or whether valid information has be[en] withheld." Subsequently, the Towns filed a motion to allow for further discovery, arguing that "[t]he dispute over the technical issues and the existence of new technical information ... re- quires this Court to allow the Towns to supplement the administrative record by conducting discovery." Joint Motion of Plaintiffs to Allow for Discovery ¶ 5 [hereinafter Discovery Motion].[2]

■ The general rule in NEPA cases is that the reviewing court should constrain its review to the record before the agency. *Aldridge*, 886 F.2d at 460. *Cf. Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (in applying APA arbitrary and capricious standard, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"). This limited review is appropriate because the relevant legal question in NEPA cases "is normally whether the Statement is 'adequate' in light of the information and comments before the agency *at the time it produced the Statement.*" *Aldridge*, 886 F.2d at 460 (emphasis added). *Accord Silva v. Lynn*, 482 F.2d 1282, 1284 (1st Cir.1973). Exceptions to this general rule exist, sometimes compelling the reviewing court to consider additional information. These situations include, for example, when new information that confirms or contradicts agency predictions becomes available, *Conservation Law Found., Inc. v. Clark*, 590 F.Supp. 1467, 1474–75 (D.Mass.1984), when the evidence indicates that the agency relied on secret sources unavailable for public scrutiny, *Aldridge*, 886 F.2d at 460, or when the plaintiff presents previously available evidence that the agency should have considered but did not. *Id.; Friends of the Earth v. Hintz*, 800 F.2d 822, 829 (9th Cir.1986). More often, new evidence is relevant only to the question of whether a supplemental EIS should be filed. *Aldridge*, 886 F.2d at 460; *Watt*, 716 F.2d at 948. After careful review of the issues the Towns raise—discussed thoroughly below[3]—I conclude that the "new" informa-

---

**2.** The technical disputes, as evidenced by the affidavit of groundwater hydrologist John P. Jemsek, Ph.D., concern the boundary of the Neponset Sole–Source Aquifer, discussed *infra* Part IV.B.1, the flow rate and direction of groundwater, *infra* Part IV.B.2.b, and the threat

to nearby public and private drinking wells, *infra* Part IV.B.2.a.

**3.** In the interest of a full and fair review of the specific objections raised by the Towns, I have in fact considered affidavits and evidence submitted by the Towns that go beyond the admin-

tion offered by the Towns is not of the ilk that makes additional discovery appropriate. In general, the Towns present evidence and studies that merely *disagree* with EPA's conclusions, but nothing to indicate that EPA ignored relevant information or relied on secret sources.

 The Towns also encourage me to "allow the introduction of new evidence, including expert testimony, in order to aid the court in understanding highly technical environmental matters." Discovery Motion ¶ 7. True, the court, *in its discretion,* may admit additional evidence in NEPA cases for aid in understanding complex evidence. *Aldridge,* 886 F.2d at 460–61. I decline the Towns' generous offer. While I make no claim to the expert's understanding of every technical nuance of the residuals management effort, I have reviewed the record carefully, I have researched the applicable legal standards, I have the benefit of six years of experience in overseeing the Boston Harbor project, and I have viewed and walked the site. With that as support, I believe I understand the issues presented, and I believe those issues can be fairly addressed with the existing record. I therefore deny the Towns' motion to allow further discovery and proceed to assess the merits of the summary judgment motion of basis the voluminous and adequate record already before me.

## IV

The Towns filed with their opposition memo a Statement of Contested Facts, as required by Local Rule 56.1.[4] The Towns' statement lists fifteen issues of fact they contend are disputed and that preclude summary judgment from being entered against them. The record is extensive and, consequently, this memorandum will be lengthy. To facilitate public scrutiny and the appellate review that will follow, I have addressed each of the fifteen issues raised in the Statement of Contested Facts *seriatim.*

### A. *Completeness of the Administrative Record*

 The first disputed issue is whether the court has before it the entire administrative record on which EPA based the EIS. Statement of Contested Facts ¶ 1. The Towns state that the entire record is not before the court; they contend that EPA considered sources not included in the administrative record.

EPA has filed with the court a 59–page index (with roughly 40 entries per page) entitled "Residuals Management Administrative Record." The index was authenticated by the affidavits of Gwen S. Ruta, Chief of the Marine and Estuary Protection Section of the Water Quality Branch of the Water Management Division of EPA Region I, and of Richard P. Kotelly, Deputy Director of the Water Management Division, who was officially designated custodian of the records relating to the EIS. *See* Defendants' Exhibit 16 [hereinafter Def. Ex.]. The plaintiffs' brief suggests that the following items are missing from the administrative record: MWRA's scoring sheets for the 300 sites originally screened for disposal of residuals, the sensitive receptor list for the Walpole site, the documents relied upon by EPA's consultants, and the documents relied upon by MWRA. Memorandum of the Plaintiffs ... in Opposition to the Defendants' Motion for Summary Judgment at 15–17 [hereinafter Plaintiffs' Brief].

While EPA concedes that the actual scoring sheets for each of the 300 sites are not included in the administrative record, it points out that the record does contain MWRA's two-volume Draft Report on Site Screening Analysis. Administrative Record Document No. 423 [hereinafter A.R. No.]. This document, which was publicly available in the state environmental review process, describes the methodology and results of MWRA's site screening pro-

istrative record. For reasons stated in the discussion below, none of these persuade me that further discovery is necessary.

4. Local Rule 56.1 provides in pertinent part: "Opposition to motions for summary judgment shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried...."

cess; it contains as appendices the actual scoring sheets for the twelve candidate sites that MWRA recommended (ten of which are discussed in the EIS), as well as several tables in the text showing the overall ratings of all 300 sites for various indicia of technical and environmental suitability. EPA further argues that it did not rely solely on MWRA's data, but subjected the screening to its own analysis. The record contains EPA's detailed responses to MWRA's screening process, A.R. No. 573 (Def.Ex. 3), which was critical of MWRA's results. EPA's reliance on MWRA studies is discussed at length below, *infra* Part IV.C, but suffice to say for the moment that the absence from the record of detailed scoring sheets for the 290 sites not evaluated in the EIS does not compromise this court's ability to assess whether EPA's discussion of alternatives was arbitrary and capricious.

As to the sensitive receptor list for the Walpole site, this is listed at page 47 of the index as A.R. No. 1412. The administrative record, though not actually filed with this court because of its extreme bulk, has been available for my review. For the record, it is stored in Room 1118A of this courthouse building. It is comprised of about 25 boxes of documents and covers the floor of the room in which it is located. A trip to Room 1118A confirmed the existence of A.R. No. 1412. In addition, the DSEIS itself contains a list and map of sensitive receptors near the Walpole site. DSEIS app. C, at C–1 to –3. This list included in the DSEIS, incidentally, is more extensive than A.R. No. 1412.

The administrative record also contains documents prepared by and relied upon by EPA's consultant, Metcalf & Eddy, Inc. Affidavit of Richard P. Kotelly ¶ 6 (Def.Ex. 18). The Towns present no evidence to contradict Mr. Kotelly's sworn statement.

To the extent that the Towns argue that the administrative record must also contain all documents on which MWRA relied to create the documents on which EPA relied, I must disagree. EPA has made a good-faith effort to collect every document on which it actually relied in preparing the EIS, and I am not prepared to ask for more.

I therefore find that the Towns have not established a genuine issue of material fact concerning whether the court has the full administrative record before it.

### B. Groundwater Issues

■ The second purported issue of contested fact is that "[n]ew factual information has come to light since the publication of the ROD which demonstrates that the SEIS did not adequately consider the groundwater impacts of the proposed landfill." Statement of Contested Facts ¶ 2. As noted above, *see supra* note 2, this new factual information concerns the boundary of the Head of the Neponset Sole–Source Aquifer, threats to nearby drinking water supply wells, and the public health concerns posed by the travel of the contaminants contained in landfill leachate. While the Statement of Contested Facts specifies that the groundwater disputes center around "new factual information," the briefs also focus on the adequacy of the EIS with respect to these issues. For the sake of completeness, I will review both the adequacy of the EIS and the materiality of the new factual information.

I preface this discussion by noting that the damage to groundwater sources of the Towns will be realized only upon the occurrence of a leak in the landfill. Conversely, EPA's assessment of the threats to the groundwater supplies were predicated on its background assumption that the landfill will incorporate state-of-the-art design and will be surrounded by devices to monitor and detect any leakage so that remedial steps can be taken as early as possible. *See infra* Part IV.*I* for a more detailed account of the landfill design and contingency plans in the event of leakage. The following discussion of groundwater threats must be viewed in this context.

### 1. Aquifer

One of the contested issues that most troubles the Towns—and with which the court is deeply concerned—involves the threat of danger to public drinking water

supplies caused by the proximity of the landfill site to the Head of the Neponset Sole–Source Aquifer recharge area. A "sole-source aquifer" is the Safe Drinking Water Act's designation for an area's aquifer "which is the sole or principal drinking water source for the area and which, if contaminated, would create a significant hazard to public health." 42 U.S.C.A. § 300h–3(a)(1) (West 1982). The Town of Walpole draws its entire drinking water supply from the Neponset Sole–Source Aquifer, which EPA designated in response to a petition from the town residents. *See* 53 Fed.Reg. 49,920 (1988), A.R. No. 2421 (Def.Ex. 8).

State law prohibits placement of solid waste landfills over the recharge area of a sole-source aquifer, Mass.Regs.Code tit. 310, § 16.40(3)(a)(6) (1990), while the Safe Drinking Water Act prohibits federal funding of projects that will harm aquifers. 42 U.S.C. § 300h–3(e); 40 C.F.R. § 149.102(a) (1990). EPA argues that neither of these laws would be applicable to the landfill even if it were located within the aquifer boundary. This contention aside, the purpose of my review here is to assess EPA's determination that the landfill does not lie within the aquifer recharge area.

The boundaries of the aquifer, as designated by EPA, include the surface area above the aquifer system and its recharge area. In designating the Neponset Sole–Source Aquifer, EPA adopted the boundaries proposed by the Town in its petition. The EIS concludes that the proposed landfill lays entirely outside the aquifer boundary, particularly noting that the groundwater at the site flows to the Charles River drainage basin rather than toward the Neponset River. The DSEIS flags this determination as an area of substantial concern:

> The site falls just outside of the head of the Neponset Sole–Source Aquifer (Figure 4.4–2) as petitioned for the town of Walpole and designated by EPA in No-

vember 1988. The aquifer boundaries are based on the delineated surface water drainage divide of the Charles and Neponset River drainage basins. Walpole is currently considering re-petitioning the boundaries of its sole-source aquifer designation based on groundwater drainage divides. Additional sampling would be needed to definitively verify that no groundwater from the site contributes to the Neponset Sole–Source Aquifer. If the aquifer's boundary was determined to extend into the landfill footprint, more extensive review of the potential landfill by EPA would be necessary to determine if it could contaminate groundwater and pose a threat to public health.

DSEIS § 4.4.3.2, at 4–93. The FSEIS states the results of additional sampling, "The MWRA has also conducted additional field reconnaissance and evaluation of topography, groundwater elevations, bedrock outcroppings and overall site drainage and has confirmed the previous findings that groundwater from the site drains away from the Neponset Sole Source Aquifer and into the Charles River Basin." FSEIS § 5.1.1, at 5–2. The FSEIS thus incorporates by reference—albeit rather obliquely —MWRA's additional studies. It is permissible for an EIS, in order to "cut down on bulk," to incorporate by reference studies that are "reasonably available for inspection by potentially interested persons." 40 C.F.R. § 1502.21 (1990).[5] The studies to which the FSEIS refers are contained in the state environmental impact report, 1 FEIR app. B, at B–28 to –60, and were readily available for public perusal.

Based on my review of the EIS, I conclude that the Towns have not produced evidence that EPA, based on the evidence available at the time, arbitrarily, capriciously, or in bad faith considered the boundary of the Neponset Sole–Source Aquifer. Rather, the EIS clearly discloses EPA's

---

5. Moreover, EPA is permitted to, and indeed encouraged to, rely on the MWRA's scientific research. 40 C.F.R. § 1506.2(b)(2) ("Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local require- ments.... [S]uch cooperation shall to the fullest extent possible include: ... [j]oint environmental research and studies."). I further discuss the EPA's reliance on MWRA studies *infra* Part IV.C.

concern with the issue and the additional steps it took to confirm its preliminary conclusions.

The Towns also wish to present new evidence compiled after completion of the EIS. As the DSEIS anticipated, the Towns eventually did petition for redesignation of the aquifer in August, 1990. *See* Affidavit of John P. Jemsek ¶ 16 & Ex. A. The petition suggests that the groundwater divide between the Charles River and Neponset River basins is actually located in the middle of the landfill site. EPA has not yet ruled on this petition; in response, it asked the Towns to revise certain figures, which had been derived from monitoring wells that were found to be incorrectly mapped, and to submit additional data. *See* Affidavit of Joanne Muti ¶ 5 & Ex. A.

■ As previously noted, the EIS's original consideration of the aquifer boundary was reasonable. The question presented by the Towns' new information with respect to the location of the groundwater divide is whether EPA should *supplement* its EIS pursuant to 40 C.F.R. § 1502.9(c). The court must review EPA's decision not to supplement the EIS "by asking whether that decision was reasonable under the circumstances." *Watt*, 716 F.2d at 948. At this juncture, however, such review is premature. After studying the Towns' petition, EPA concluded that "additional field data would be necessary to describe aquifer flow patterns and geology with sufficient accuracy to enable EPA to reach a determination as to the validity of the conclusion in the [redesignation] Petition." Affidavit of Douglas L. Heath ¶ 7. *See also id.* Ex. A (letter of Richard Kotelly to Joanne Muti (Oct. 18, 1990)). Currently, EPA is simply unable to determine whether the Towns have raised "significant new circumstances or information" that would require EPA to prepare a supplement. 40 C.F.R. § 1502.9(c)(1)(ii) (1990).

■ The function of this court is not to sit in judgment over the agency's technical

conclusions. I need consider only whether EPA's consideration of the location of the groundwater divide, and the discussion of that issue in the EIS, are adequate. I find that they are, and the Towns have not demonstrated a *material* issue of disputed fact that needs to be resolved before I can hold that the treatment of the aquifer issue in the EIS was adequate as a matter of law. *Rossy v. Roche Prods., Inc.*, 880 F.2d 621, 624 (1st Cir.1989).

### 2. Water Supply Wells
### a. Zone II Boundary Determination

Ten water supply wells are located in the vicinity of the Walpole site. Of particular concern to the plaintiffs are four wells that supply water to the prison facilities at MCI–Norfolk and also serve as a back-up drinking water supply to the Town of Norfolk. The Towns argue that EPA's delineation of the "Zone II Recharge Area"[6] for the prison wells was based on "groundwater modeling ... [that] involved a number of serious erroneous and prejudicial assumptions." Plaintiffs' Brief at 27.

The DSEIS includes a fairly detailed explanation of the groundwater characteristics of the Walpole site. DSEIS § 4.4.3.2. It refers to two studies conducted to determine the Zone II boundary for the wells in question and includes a map showing the result of these studies. *Id.* at 4–97, –99. Both studies concluded that the landfill footprint is not within Zone II.

■ In the public comment period, the Towns objected to the methodology and results of the Zone II studies. In assessing challenges to the FSEIS, the court must determine whether the agency reasonably addressed public comments or instead thwarted NEPA's intent by "prevent[ing] stubborn problems or significant criticism from being shielded from internal and external scrutiny." *Grazing Fields Farm*, 626 F.2d at 1072. The regulations suggest an array of possible responses to public

---

**6.** A Zone II Recharge Area is "that area of an aquifer which contributes water to a well under the most severe recharge and pumping conditions that can be realistically anticipated." Mass.Regs.Code tit. 310, § 16.02 (1990). Massachusetts law prohibits siting solid waste landfills within a Zone II area. *Id.* § 16.40(3)(a)(1).

comments. *See* 40 C.F.R. § 1503.4. With regard to Zone II, the FSEIS states,

> Additional analyses conducted by MWRA have demonstrated that the landfill does not lie within the Zone II area of the prison wells and that only a small portion of the landfill footprint is located within Zone III.... Based on a detailed examination of the procedures and assumptions of MWRA's investigations and a thorough review of additional sources of information as outlined in the Draft SEIS (Section 4.4.3.2), EPA supports the conclusion that the landfill footprint lies outside of the Zone II and Neponset Sole Source Aquifer boundaries.

FSEIS § 5.1.1, at 5–1 to –2. MWRA's additional analyses, which responded to the Towns' and others' comments regarding the Zone II boundary by reformulating its groundwater modeling, is set out in 1 FEIR app. B, at B–63 to –120. Having reviewed MWRA's revised study, on which the EIS relies, I conclude that EPA adequately responded to the Towns' comments.

The EIS did a rather poor job, however, of incorporating by reference MWRA's studies with respect to both the Zone II delineation and the aquifer groundwater divide, *see supra* p. 877, for it does not cite the FEIR with specificity. *See* FSEIS § 5.1.1, at 5–2. Nonetheless, I do not believe that this compromises the adequacy of the EIS with regard to these issues. The regulations call for the incorporated material to be "cited in the statement and its content briefly described." 40 C.F.R. § 1502.21. While the EIS did not exactly cite the FEIR in traditional form, the reference was adequate to steer potentially interested persons toward the source document.

■ Having thus disposed of the question of adequacy of the EIS, I turn to the Towns' assertion of "new factual evidence." As I have previously noted, *see supra* pp. 874–875, the situations in which the court must consider new evidence are uncommon. Having reviewed the affidavits of David Lang and John P. Jemsek, I find that the asserted new evidence does not support any of the exceptions that

would warrant looking beyond the administrative record. On the contrary, the Towns' experts again, and rather predictably, raise the same objections to which MWRA and EPA have already responded. For example, Dr. Jemsek cites the results of a report submitted with the Town of Walpole's aquifer redesignation petition, which, he says, "documents the existence of pathways for contaminant, including bedrock fractures and permeable basal glacial deposits, which, in my opinion, were not addressed adequately in either the EIR or the SEIS." Affidavit of John P. Jemsek ¶ 17. Yet these are precisely the issues that EPA already considered, perhaps not adequately in Dr. Jemsek's opinion, but adequately as far as NEPA is concerned; furthermore, EPA concluded that the Towns' report, on which the Jemsek affidavit relies, was based on unreliable evidence. *See supra* p. 878.

The Towns raise a few specific objections to the Zone II determination that merit further comment, although none ultimately rise to the level of creating a genuinely disputed issue of material fact. For instance, the Towns flourish certain internal memoranda written by EPA hydrogeologist Douglas Heath discussing the possible presence of fractures in the bedrock near the landfill site that might affect the flow of water toward the prison wells. Quotations chosen by the Towns create the impression that there were serious misgivings within EPA regarding the bedrock, and that these were "swept under the rug" by EPA. Indeed, the EIS makes only a passing reference to "bedrock outcroppings." FSEIS § 5.1.1, at 5–2.

On closer inspection, however, the hydrogeologist's memoranda do not discredit the EIS. In fact, read in their entirety, Mr. Heath's statements actually support the conclusion that the Zone II boundary is *smaller* than the EIS studies indicated, and hence that the wells are less vulnerable than MWRA and EPA assumed they were. *See* Memorandum from Douglas L. Heath to Gwen Ruta at 2 (Nov. 2, 1989), A.R. No. 2167 (Pl.Ex. 5); Responses of Douglas L. Heath to Issues Presented in Letter to

Joanne Muti at 3 (Mar. 16, 1990), A.R. No. 2551 (Pl.Ex. 6). In addition, Mr. Heath's comments were part of a larger discussion among federal and state regulators about the groundwater issues. The determination of the regulators, as evidenced in the memorandum of an EPA consultant, was that "although the Zone II modelling is deficient in many respects, it is probably adequate to determine if the landfill falls within the Zone II and ... changes to the model would probably not greatly affect the boundary delineation." Memorandum from Roger Grenier to Distribution (Sept. 19, 1989), A.R. No. 1762 (Def. Ex. 21). The Towns characterize this statement as an admission that the Zone II delineation was faulty; EPA characterizes it as a reasoned judgment that enough research had been done and that the issues raised were properly taken into account.

■ While an agency may not rely on the administrative record as a substitute for what should be contained in the EIS, the court may consult the administrative record to determine whether a particular item is of enough significance that it must be contained in the EIS. *Grazing Fields Farm*, 626 F.2d at 1074. Based on my review of the administrative record, I find that EPA's decision not to include in the EIS a detailed discussion of the bedrock was not unreasonable in light of the many factors involved in the Zone II boundary delineation. *See Coalition on Sensible Transportation, Inc. v. Dole*, 826 F.2d 60, 66 (D.C.Cir.1987) ("It is of course always possible to explore a subject more deeply and to discuss it more thoroughly. The line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts.").

■ A review of the record also supports the conclusion that this decision was made in good faith. The Grenier memorandum indicates that the regulators' greatest reservation regarding the Zone II determination concerned "pumping scenarios," that is, the effect of increased use of the prison wells. This issue, unlike the bedrock issue, was later studied in depth. *See* 1 FEIR app. B, at B–94 to –120. Moreover,

the Grenier memo concluded that EPA "will likely approve the Walpole–MCI Site *provided that a very extensive monitoring and mitigation plan is established."* (Emphasis added.) This statement indicates that EPA took the Zone II question seriously, had conducted tests that it believed were reasonably necessary, and sought to be prepared with a fail-safe should their assessment prove incorrect.

■ The Towns also wish to present new evidence that "virtually every MWRA monitoring well within the site had been incorrectly mapped." Affidavit of Joanne Muti ¶ 7. The Towns argue that these errors in monitoring affect the accuracy of the Zone II and Neponset Sole–Source Aquifer boundary determinations. The defendants argue that this evidence is irrelevant because the incorrectly mapped wells to which the Muti affidavit refers were installed *after* the EIS had been issued and, therefore, were not relied upon for any data in the EIS. Affidavit of Douglas L. Heath ¶ 4; *id.* Ex. A at 3 (Def. Ex. 28). A careful inspection of the record confirms Mr. Heath's statements. The locations of the monitoring wells used in the Zone II and aquifer delineations are shown in volume one of the FEIR, Figures 4–15 and 4–16. A.R. No. 423. The Muti affidavit states that MW–20, MW–22, MW–24, and OW–1 are mapped incorrectly. None of these appear on the FEIR maps, MW–19 being the highest number on any of the wells shown, thus verifying the Heath affidavit. The plaintiffs have failed to raise any genuine issues of material fact with respect to the Zone II boundary determination.

#### b. Time of Travel Calculations

Another important consideration in assessing the threat to the drinking-water wells in the vicinity of the landfill, should a leak occur, is the time it would take any released contaminants to reach the sources from which the wells draw their water. The Safe Drinking Water Act Amendments of 1986, codified at 42 U.S.C. §§ 300f–300j, require the states to develop programs "to protect wellhead areas ... from contami-

nants which may have any adverse effect on the health of persons." 42 U.S.C.A. § 300h–7(a) (West Supp.1990). EPA is charged with issuing technical guidance to the states in making their determination of wellhead areas. The time of travel of contaminants in various hydrologic conditions is an important factor in these determinations. The Towns challenge that EPA did not follow its own regulations in calculating the time of travel of groundwater from the landfill to the drinking water wells near the site. The Towns have culled from an EPA consultant's memo, A.R. No. 1634 (Pl.Ex. 22), a "smoking gun" to support this charge—a hearsay statement of EPA supervisor Ruta to the effect that "the calculation was done under time & budget pressure and was therefore somewhat quick & dirty." [7]

■■■ I need go no further than the EIS to answer the Towns' concerns here. The DSEIS, although stating that the landfill would contain several design features that would make a leak unlikely, discussed the possible impact of a leak of contaminants. It summarized in some detail the study it conducted, which took into account time of travel calculations and certain rates at which it assumed water would be pumped from existing wells. DSEIS § 5.5.2.2. In response to public comment, the FSEIS noted, "Commentors [sic.] asked for a more thorough discussion of the method used to develop the time of travel estimate." FSEIS § 5.1.3. The FSEIS contained a more thorough discussion in § 3.3.2, and in Appendix A. Appendix A includes a detailed explanation of the mathematical model that EPA used to estimate groundwater flow, including a discussion of the time of travel calculations. *See id.* § A.6. The time of travel section states, "In response to commentors on the Draft SEIS and as part of the expanded technical evaluation of the MWRA–preferred plan, additional analyses of the groundwater travel time have been prepared for the Final

SEIS." *Id.* at A–5. There are many adjectives that may describe the calculations discussed in. Appendix A—"sophisticated" and "complex" come to mind—but "quick" and "dirty" are not among them. The EIS supports the conclusion that EPA considered the groundwater time of travel issue and adequately responded to comments. NEPA asks no more. The plaintiffs invite me to quibble with the scientific conclusions at which the EPA scientists arrived, but this is not the purpose of judicial review of NEPA cases, nor are such determinations within the courts' institutional competence. Having found that EPA has followed NEPA's procedural mandate with regard to the time of travel calculation, "the only role for a court is to ensure that the agency has considered the environmental consequences." *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980) (per curiam). The EIS clearly demonstrates that EPA considered the time of travel calculations.

Another time of travel dispute concerns the two private wells located nearest the site. *See* FSEIS § 3.3.1, at 3–5 & Figure 3.3–1, at 3–6. Appendix A states that the groundwater travel times for these two wells were estimated at nine and eleven years, respectively. *Id.* at A–7. Indicative of the detailed level of scrutiny to which the Towns have subjected the EIS, the Towns have unearthed a document that calculates a "rough estimate" of groundwater travel time from the landfill to a nearby dog kennel's wellfield (one of the two private wells) as 5.8 years rather than 9, as stated in the EIS. Affidavit of David Lang ¶ 4 & Ex. B. The defendants, in response, produce what they say is a superseding calculation, which estimated the landfill-dog kennel groundwater route at 9.6 years. A.R. No. 1766 (Def. Ex. 27). I cannot conclude that the plaintiff's evidence of a dog-kennel travel-time cover-up calls into question the good faith of the

---

7. Ms. Ruta referred to an assumption used in the calculations. Nothing in NEPA prohibits "quick and dirty" assumptions, so long as they are reasonable. *See, e.g., Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,*

462 U.S. 87, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) (upholding as reasonable the NRC's "zero-release" assumption, the assumption that technology will be developed to isolate radioactive wastes from nuclear energy facilities).

882

EIS. What this evidence indicates to me, rather, is that EPA has considered every detail of this project in depth.

### 3. Leachate Contents

■ A third challenge to the adequacy of the EIS's consideration of groundwater impacts centers around the Towns' assertion that the "leachate travel time analysis and sludge characterization" on which EPA relied were "totally erroneous." Plaintiff's Brief at 34. With regard to the travel time calculations, I need not repeat the discussion above; I merely restate my conclusion that EPA's consideration of groundwater time of travel calculations, as evidenced in the EIS, was not arbitrary and capricious.

With regard to the chemical analysis of residuals, the Towns are not unreasonably concerned by statements in the DSEIS concerning EPA's public health analysis for the Walpole site. Although the DSEIS includes a toxicity analysis of 52 pollutants likely to be found in "digested" sludge and concludes that the sludge is not hazardous, DSEIS § 3.1.1.2, at 3–6 to –9, the DSEIS quite candidly discusses the risk posed by public contact with leachate from the landfill. *See id.* § 5.9.3.2. The DSEIS also includes an estimate of pollution to drinking water that would be caused by the "highly unlikely" event of a leak in the landfill liner. *Id.* § 5.5.2.2.

In challenging the rationality of EPA's analysis, the Towns offer the opinion of Dr. Bela T. Matyas, M.D., M.P.H., M.S. (submitted in response to the *F*SEIS), which states that EPA's choice of chemicals for analysis "completely overlooks VOCs, PCBs and PAHs, virtually completely overlooks SVOCs, and is even incomplete for likely metals." Plaintiffs' Brief app., Comments of the Town of Norfolk, at 338 [hereinafter Norfolk Comments]. Dr. Matyas further states,

> The inclusion of toxic VOCs in the exposure assessment modeling would almost certainly have yielded results showing potential contamination of groundwater by VOCs at concentrations hazardous to public health (based on the concentrations of VOCs present in scum and likely

present in sludge, and on the leaching characteristics of VOCs). In any case, the indicators chosen clearly *do not* represent the true spectrum or realistic degree of potential public health risks posed by the Walpole–MCI landfill.

*Id.*

Dr. Matyas's analysis provides the court with a background against which to review the EIS's public health assessment. As to Dr. Matyas's criticism of EPA's choice of indicators, it is not for the court to tell EPA which pollutants and metals it need consider. From my review of the EIS, I am satisfied that EPA's choice of 52 toxins was reasonable.

Although Dr. Matyas's concerns about the exclusion of VOCs give me pause, I need look no further than the FSEIS for reassurance. In EPA's responses to comments about its toxicity analysis, the FSEIS first clarified the difference between "minor residuals"—that is, grit and screenings—and sludge. With respect to the former, the FSEIS states, "No testing was done for Volatile Organic Compounds (VOC's) in grit and screenings because no VOC's are expected to be present in them." FSEIS § 5.5.1, at 5–15. The EIS goes on to explain this conclusion. With respect to sludge, the EIS states that it would be "extremely unlikely" for VOCs to be present "because these pellets are heat dried at 700 degrees Fahrenheit and routed through an afterburner which would volatilize and destroy any VOC's remaining." *Id.* § 5.5.2, at 5–17. This is an adequate explanation. Once again, despite their reference to "new factual information" in their statement of contested facts, the plaintiffs offer no evidence that requires looking beyond the EIS and the administrative record.

### C. Discussion of Alternatives

The Towns claim that there is a disputed issue of fact regarding whether EPA adequately discussed alternatives to the proposed project. Statement of Contested Facts ¶ 3.

The procedures mandated by NEPA require the proponent agency to prepare a

detailed statement of alternatives to any proposed action. 42 U.S.C. § 4332(2)(C); *Silva v. Lynn,* 482 F.2d 1282, 1284 (1st Cir.1973). The Towns first argue that EPA has not satisfied NEPA because the *final* EIS does not include a detailed discussion of alternatives. For this proposition, they cite *Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068 (1st Cir.1980). *Grazing Fields Farm,* however, distinguished between the EIS and the administrative record, not between the draft and final EIS. EPA counters correctly that NEPA can be satisfied when the discussion of alternatives is included in the *draft* EIS and the *final* EIS consists only of responses to comments on the discussion of alternatives contained in the draft. *See* 40 C.F.R. §§ 1500.4(m), 1503.4(c). In addition, the EIS may incorporate other publicly available documents by reference. *Id.* § 1502.21. Satisfied that the relevant discussion of alternatives from the draft EIS can satisfy NEPA, I turn to the merits of plaintiffs' argument.

Accurately foreseeing the demise of their draft/final EIS distinction, the Towns prudently addressed the bulk of their challenges to the alternatives discussion included in the DSEIS. They argue that the discussion of alternatives, even when the DSEIS is considered, is insufficient. With regard to discussions of alternatives, the applicable NEPA regulations are as follows:

> This section is the heart of the environmental impact statement.... [I]t should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:
>
> (a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.
>
> (b) Devote substantial treatment to each alternative considered in detail....
>
> (c) Include reasonable alternatives not within the jurisdiction of the lead agency.

> (d) Include the alternative of no action.

40 C.F.R. § 1502.14.

The Towns argue that the EIS failed to comply with these standards because EPA (1) wrongly relied on MWRA's site selection process (which, the Towns further argue, was biased); (2) did not adequately discuss the reasons why sites were eliminated from detailed study; and (3) did not properly consider the no-action alternative. Each of these contentions, however, fails to create a genuine issue of material fact.

Plaintiffs' first argument is that EPA's conceded practice of "piggybacking" its site selection research on MWRA's prevented it from independently and objectively considering alternatives. The statute and the regulations, however, encourage sharing information and cooperation between state and federal agencies. *See* 42 U.S.C. § 4332(2)(D); 40 C.F.R. § 1506.2(b)-(c).

The extent to which a federal agency may properly rely on a state or local body in preparing an EIS was discussed in *Concerned Citizens on I–190 v. Secretary of Transp.,* 641 F.2d 1 (1st Cir.1981). The plaintiff had challenged as procedurally inadequate the U.S. Department of Transportation's reliance on the Metropolitan District Commission's determination that the proposed site of a segment of highway did not constitute "significant publicly-owned recreation lands." The First Circuit held that for "threshold questions" the agency may, and in fact should, consider the views of local officials. *Id.* at 7. The court distinguished such threshold matters from "the agency's ultimate decision as to the lack of 'feasible and prudent alternatives,'" which must be made independently. *Id* (citation omitted).

The Towns in essence argue that EPA's reliance on MWRA's site screening was procedurally inadequate. This argument would certainly win the day if the Towns could show that EPA's final choice of the Walpole site merely rubber-stamped MWRA's decision. But this is not what the Towns' evidence shows. MWRA began with a list of 300 sites and narrowed the list to twelve alternative sites. *See* Draft

Report on Site Screening Analysis, A.R. No. 423. EPA admits that it relied on MWRA's screening process up to this point, although the EIS states that "[a]t each major milestone in MWRA's screening process, EPA employed NEPA-mandated screening criteria to ensure that the results of MWRA's screening were consistent with the requirement for coverage of a full, reasonable range of alternatives." DSEIS § 2.1.2. EPA's independent review resulted in the elimination of two of MWRA's sites. *See* Letter from Gwen Ruta to James Hoyte, Sec'y of Environmental Affairs (Nov. 20, 1987), A.R. No. 573 (Def. Ex. 3). I conclude that it was both procedurally permissible and reasonable for EPA to rely on MWRA's initial screening to narrow the set of alternatives to twelve, and then to eliminate two under its own criteria.

■ As to the Towns' second contention, I hold that EPA did not violate 40 C.F.R. § 1502.14(a) by failing to include in the EIS a brief discussion of why each of the 290 sites evaluated by MWRA in the preliminary screening was eliminated. While it cannot comfortably be characterized as either, this screening process was more like a threshold decision than an ultimate conclusion. *Concerned Citizens on I–190*, 641 F.2d at 7. Keeping in mind that, in reviewing agency action under NEPA the court must apply a "rule of reason," I hold that the ten sites ultimately considered encompassed a sufficient range of "reasonable alternatives" to satisfy NEPA. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978) (alternatives section "cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man"); *Seacoast Anti–Pollution League v. NRC*, 598 F.2d 1221, 1232 (1st Cir.1979) ("[a]lternative sites cannot be studied *ad infinitum*").

The court's substantive review of the DSEIS's evaluation of alternatives is limited to considering whether the agency's action was "arbitrary and capricious," that is,

whether there was a balanced, good faith consideration of environmental factors. "The legal question ... is whether the EIS's discussion of the alternatives was a reasonable one." *Aldridge*, 886 F.2d at 461 (citing *Vermont Yankee*, 435 U.S. at 551, 98 S.Ct. at 1215). I conclude that the discussion of alternatives was reasonable.

■ The screening process, discussed above, resulted in the selection of ten candidate sites using different combinations of technologies for sludge disposal. Four of these were eliminated, and, as required by 40 C.F.R. § 1502.14(a), the EIS gives brief explanations why they were. DSEIS § 2.4. The bulk of the DSEIS contains detailed analysis and comparison of the six remaining combinations of sites and technologies using the following criteria: land use, transportation and traffic, air quality and odors, water and soils, noise, visual, aquatic and terrestrial ecosystems, public health, historic and archaeological, and socioeconomic. On my review of the EIS in light of the administrative record, I find no basis for the claim that the discussion of alternatives was arbitrary and capricious or conducted in bad faith. On the contrary, the DSEIS presents a carefully conducted study of the six alternatives.

■ Finally, the Towns argue that the EIS does not comply with NEPA because EPA did not adequately consider the no-action alternative. *See* 40 C.F.R. § 1502.14(d). The EIS states that the no-action alternative—that is, not developing a long-term plan for disposal of residuals— would result in the resumption of the dumping of sludge in the Harbor, the very infraction that the plan seeks to cure. DSEIS § 2.1.3. This rejection of the no-action alternative was reasonable.

The Towns argue that the no-action alternative in this case need not be as bleak as EPA suggests, but instead could consist of commercial disposal or ocean disposal of residuals. *See, e.g.*, Affidavit of Dr. Derek W. Spencer (discussing ocean disposal option). The EIS, however, does consider both of these options and states reasons for rejecting them. Ocean disposal, for example, was rejected because of opposi-

tion by Congress, including passage of the Ocean Dumping Ban Act of 1988, codified at 33 U.S.C.A. § 1414b(a)(1)(B) (West Supp. 1990), which prohibits ocean dumping of municipal sludge after 1991. DSEIS § 2.2, at 2–5. Privatization was also ruled out "[o]n the basis that this would remove control of sludge processing from the MWRA." *Id.* at 2–7. I find the discussions of these "no-action" alternatives reasonable. *See also Roosevelt Campobello Int'l Park Comm'n v. EPA*, 684 F.2d 1041, 1047 (1st Cir.1982) (stating that "an intervenor must offer tangible evidence that an alternative site might offer 'a substantial measures of superiority' as a site") (citing *Seacoast Anti–Pollution League v. NRC*, 598 F.2d 1221, 1228–33 (1st Cir.1979)). The Towns have not established a genuine issue of fact to support the conclusion that this rejection of the no-action alternative was arbitrary and capricious.

 One last issue raised by the Towns should be addressed before leaving this subject. The Towns have produced a memorandum submitted to MWRA from a public relations firm called "Fanfare" describing "public acceptance strategies" for the residuals management plan; the memorandum describes a method of isolating opposition to any chosen site. Memorandum from Howard Coffin *et al.* to Melanie Thomas *et al.* (Dec. 29, 1986), Pl.Ex. 12. This memo, they argue, supports an inference that the site-selection process was not conducted in good faith. I reject this argument for several reasons. First, the Towns produce no evidence that this strategy was ever actually employed. Second, on my reading of the Fanfare memo, I find that the purported strategy does not suggest any method for *selecting* a site; rather, it explains how to publicize the final site selection without generating widespread opposition to the entire project. Finally, even if the site-screening process was tainted by this alleged bad faith on the part of MWRA, EPA's detailed discussion of alternatives certainly cures any taint by providing a balanced, objective, and independent analysis on the public record. *See De Arteaga v. Pall Ultrafine Filtration Corp.*, 862 F.2d 940, 941 (1st Cir.1988) (at summa-

ry judgment, "the question is not whether there is literally *no* evidence favoring the non-movant, but whether there is any upon which a jury could properly proceed to find a verdict in that party's favor").

### D. Expansion of the Walpole Prison

Next, the plaintiffs argue that it is disputed whether EPA considered "the fact that the landfill will foreclose expansion of the Walpole prison site." Statement of Contested Facts ¶ 4. The Towns assert that there is a "crushing need" in the Commonwealth for additional prison facilities. In their public comments, they suggested that the landfill site, as it is currently owned by the Department of Corrections, would be an ideal site for prison expansion; moreover, the Town of Walpole's Board of Selectmen has expressed a willingness to accept a new prison in lieu of a landfill. *See* Walpole Comments at 56.

The DSEIS acknowledged that "[d]evelopment of the landfill would inhibit use of the site for major construction activities in the future," although it also asserted that the site could eventually be reclaimed. DSEIS § 5.2.2. The FSEIS states that "the Department of Corrections has established expansion plans for MCI Cedar Junction, which involve an addition from the west wall of the prison. This will not be affected by the residuals management facilities in Walpole." FSEIS § 5.8. Although the Towns characterize this conclusion as "myopic," a glance at the map clearly shows that expansion of the *west* wall is not incompatible with landfill operation.

The Towns have not established a factual issue that prevents me from concluding that the EIS adequately discusses prison expansion.

### E. "Equitable Distribution of Regional Responsibilities"

The Towns argue that EPA "failed to properly apply the evaluation criterion of 'equitable distribution of regional responsibility' during the MEPA [sic.] process." Statement of Contested Facts ¶ 5.

886

At the early stages of residuals management planning, MWRA and EPA developed a list of technical, environmental, institutional, and cost criteria for screening and evaluating proposed sites for residuals management facilities. Those utilized in the DSEIS are laid out in § 2.4.1, under the heading "Evaluation Criteria." One of these is "equitable distribution of regional responsibility," defined as "[t]he extent to which candidate site communities already host major permanent wastewater treatment facilities." DSEIS § 2.4.1.4, at 2–11. The Towns point out that in an early draft of MWRA's evaluation criteria, A.R. No. 716 (Pl.Ex. 17), the term "regional responsibility" was much more broadly defined to include "public utilities and facilities." A.R. No. 716, at 2–17. As an example of such facilities, the draft stated, "Walpole is home to the state prison facility." *Id.*

The Towns pointed out this discrepancy in their public comments. In response, the FSEIS stated,

This criterion was difficult to define and no real consensus on its definition or importance was possible among the relevant parties, including state and federal agencies and citizens task forces and advisory committees.... However, the Massachusetts Secretary of the Executive Office of Environmental Affairs ... endorsed DEP's [the Department of Environmental Protection] opinion that 'this criteria [sic.] should be used to highlight the distribution of regional responsibility specifically with regard to permanent long-term wastewater facilities.'"
FSEIS § 5.2.2.

For such threshold decisions, especially as they implicate how a state chooses to evaluate the competing uses of its land, EPA can reasonably rely on the determination of state officials. *See* the discussion of *Concerned Citizens of I–190, supra* pp. 883–884. Thus, I hold that EPA's limitation of the equitable distribution criterion to include only wastewater treatment facilities was procedurally adequate. The Towns do not purport to argue that the EIS improperly applied this criterion as so defined.

*F. Impact of Prison Population*

Two prisons, MCI–Cedar Junction and MCI–Norfolk, are located near the landfill site. The plaintiffs argue that the EIS failed to consider the "adverse environmental effects of the landfill on the prison population." Statement of Contested Facts ¶ 6. Generally, the Towns charge that EPA inadequately addressed the effect on prison inmates of air pollution and odors emanating from the landfill and the danger of explosions caused by the build-up of methane gas; more specifically, the Towns complain that the EIS failed to consider that such odors might cause inmate disturbances.

EPA vainly argues that the Towns do not have standing to raise the concerns of the prison population. *See Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). The Towns persuasively counter that, having an independent basis to challenge the EIS, they may also raise public interest concerns in support of their claim. *See Sierra Club v. Adams*, 578 F.2d 389, 392–93 (D.C.Cir.1978) (allowing plaintiff/appellee environmental groups with independent basis of standing to raise the effects of proposed projects on Cuna and Choco Indian tribes). EPA dropped its standing defense in its Reply Brief.

With regard to air pollution, odors, and methane gas, however, the EIS belies the plaintiffs' substantive claim. First, EPA was aware that air quality and odors would affect the prison populations as well as other nearby "sensitive receptors." DSEIS § 5.4.3. The DSEIS frankly discusses air pollution and odors from the proposed landfill. It concludes that the facility will not emit pollutants into the air, DSEIS § 4.3.5.6, but it did disclose the possibility of odors from grit and screenings and dewatered sludge. *Id.* § 5.4.3.1. NEPA, of course, does not require an agency to eliminate adverse environmental effects; it merely requires agencies to take these considerations into account. *Watt*, 716 F.2d at 952. The DSEIS suggests mitigating these potential odors by covering the residuals daily with soil. DSEIS

§ 6.2.1, at 6–1. In addition, the EIS accounts for the possibility of build-up and explosions of methane gas and suggests design features and mitigation measures for such an occurrence. *Id.* § 3.2.6, at 3–35; FSEIS § 6.4.3.

In response to comments, the FSEIS states that no studies were available from which EPA could predict the odor impact of the disposal of wastewater residuals. "To compensate for the inability to make quantitative predictions of odors at nearby receptors, EPA made the conservative assumption that significant odors could be produced by landfill operations and that daily covering of landfilled materials would be required to control the odors." FSEIS § 5.4.5, at 5–15. The EIS, therefore, evidences an awareness that air quality and odors would affect the prison population, and it adequately addresses these concerns.

The EIS does not analyze the specific effect that air quality and odors might have on prison populations *per se* as opposed to the general population. In response to comments calling attention to the effects on inmates, the FSEIS states (1) that the effects of odors and noise are likely to be minimized because of the height of the prison walls and (2) that there are no available studies or pertinent information that would impel EPA to consider inmate populations differently from the general population with respect to the effects of unpleasant odors. FSEIS § 5.18. EPA's decision not to take into account the possibility of a prison riot thus appears a reasonable one. Moreover, requiring EPA to consider the effect on the Towns caused by the risk of a prison disturbance being precipitated by an increase in odor is simply too causally attenuated from the "environmental effects" of the agency action that NEPA requires agencies to consider. *See Metropolitan Edison Co. v. People Against Nuclear Energy,* 460 U.S. 766, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1983) (holding that NEPA does not require NRC to address psychological damage to residents caused by risk of a nuclear accident in EIS considering reopening of Three Mile Island nuclear power plant).

### G. Consideration of Economic Costs

The Towns further argue that EPA improperly elevated economic costs over environmental effects in choosing the Walpole site instead of the Rowe Quarry Site for a landfill, and, moreover, that EPA incorrectly calculated these costs. Statement of Contested Facts ¶ 7. This contention, however, is wholly unsupported by the record.

For this assertion, the Towns rely on an internal memo in which the MWRA staff recommended to MWRA's Board of Directors the Walpole site over the Rowe Quarry site. Pl.Ex. 24. In addition to discussing the memo in detail, their brief also discusses how the state EIR miscalculated costs. Plaintiff's Brief at 91. The Towns, however, wholly ignore the EIS.

The DSEIS notes that cost considerations were important to EPA in the site *screening* process. DSEIS §§ 2.2, at 2–2; 2.4.1.2. In the detailed discussion of alternatives, however, EPA stated that "costs are not a determinative factor." *Id.* § 5.1.3. The FSEIS clarified this decision not to consider cost beyond the screening stage, stating that the differences in cost estimates for the candidate sites were not statistically significant. FSEIS § 5.11. Thus, the comparison between the Walpole site and Rowe Quarry in the EIS, contrary to the Towns' assertions, was conducted without reference to costs. This fact belies the claim that the EIS improperly elevated costs over environmental concerns.

### H. Socio–Economic Impacts

The Towns argue that the EIS "failed to analyze the socio-economic impacts of the landfill." Statement of Contested Facts ¶ 8. By socio-economic impacts, the parties refer to the effect on local property values and tax revenues. The Towns' claim is that EPA failed to "conduct its own study to qualify and to the maximum extent practicable quantify" the economic harms to the Walpole–Norfolk area. Plaintiffs' Brief at 94.

I do not believe that the EIS's failure to put a dollar value on the projected decrease

in property values and the consequent reduction in property taxes was unreasonable. Rather, I find that EPA adequately studied and the EIS adequately discussed the socio-economic impacts of a landfill site in Walpole. The DSEIS discusses the property tax levy on the Walpole site; it also outlines the tax base of the Town of Walpole. DSEIS § 4.10.3. It goes on to describe property value and tax revenue impacts of the proposed landfill. *Id.* §§ 5.11.-2, 5.11.3.1. The DSEIS refrains from making specific findings with regard to property values for any of the alternative sites, stating that such impacts cannot be quantified.

> Property values are highly dependent on a number of different factors including the strength of the economy and real estate market in the area, the quality of amenities offered in the area (such as schools and other public services), and the subjective needs and desires of potential purchasers. The existence of a negatively perceived facility (such as a landfill or sludge processing plant) near a residence or other type of land use does not necessarily result in a drop in the value of that property if these other factors remain strong.
>
> However, it is possible that private properties which are not sufficiently buffered from the negative impacts of a residuals facility could experience a drop in value.

*Id.* § 5.11.2, at 5–113.

In response to commentators' dissatisfaction with this analysis, the FSEIS provides a lengthy, in-depth discussion of the property-value effects on the Walpole area. FSEIS § 3.6. Rather than conducting a new study, EPA surveyed existing studies of property value impacts of sanitary landfills, power plants, airports, and highways, applying these results to the proposed landfill. Without providing dollar figures, the FSEIS notes some negative impacts on property values. It concludes that there will be reductions in values to nearby properties because of the noise level and unsightliness of the facility. *Id.* at 3–16. It further notes that one study of sanitary landfills showed "distinctly negative impacts" in land values. *Id.* at 3–14. It distinguishes this study, however, on the basis of three specific differences between the operating conditions of the two types of landfills, concluding that "the residuals landfill should not generate as significant property value impacts as those described in the literature for sanitary landfills." *Id.* at 3–17. The discussion in the DSEIS, together with the detailed response to comments in the FSEIS, indicates that EPA adequately took socio-economic effects into account.

### I. Mitigation Measures

NEPA requires a detailed discussion "of steps that can be taken to mitigate adverse environmental consequences," *Methow Valley,* 490 U.S. at 351, 109 S.Ct. at 1846 (citing 40 C.F.R. § 1508.20), but it does not contain "a substantive requirement that a complete mitigation plan be actually formulated and adopted." *Methow Valley,* 490 U.S. at 352, 109 S.Ct. at 1847. The Towns charge that the EIS fails to discuss mitigation measures "in sufficient detail." Statement of Contested Facts ¶ 9. Specifically, the Towns assert that the EIS, first, fails completely to include any discussion of mitigation for the foreclosure of prison expansion and the destruction of prime agricultural land caused by the landfill and, second, does not discuss the shortcomings and costs of its planned mitigation measures for contamination of groundwater supplies.

The adequacy of EPA's discussion of prison expansion was discussed *supra* Part IV.D. EPA concluded that the construction of a landfill would not interfere with any planned prison expansion, thus, there was no land use conflict to mitigate. The solution of the Commonwealth's prison overcrowding problem is beyond the scope of the long-term residuals management EIS.

The destruction of agricultural land is discussed *infra* at Part IV.J. Suffice to say for the moment that EPA concluded that the loss of agricultural land was insignificant. DSEIS § 5.2.2. As a mitigation measure, EPA suggested that MWRA ac-

quire a parcel of "undeveloped prime farm-land" in the vicinity of the Walpole site. This suggestion was included in a table of mitigation measures. DSEIS Table 6.2–1, at 6–3. The only mention in the FSEIS of mitigation for the lost agricultural use is also found in a table, which repeats the phrase from the DSEIS nearly verbatim. FSEIS Table 6.4–1, at 6–11. While this is not a very imaginative solution, as EPA states in its brief, "it is hard to imagine what more could have been done." Defendants' Reply Brief at 65.

The EIS discusses mitigation of ground-water contamination in detail. DSEIS § 3.2.6. The primary safety measure is to design the landfill with a double liner to prevent leachate leakage. From the bottom up, the secondary liner, one foot thick, is proposed to be made of natural materials such as clay or bentonite, covered with eighteen inches of sand. On top of this lies the primary liner of impermeable synthetic material, also covered with eighteen inches of sand. The second line of defense is a system of leachate collection pipes running through the sand layers to absorb the leachate and carry it to a storage, pumping, and, possibly, pretreatment facility, from where leachate will be discharged into the sewer. Furthermore, there will be at least five feet of unconsolidated soil between the landfill bottom and the groundwater table. *See* DSEIS Figures 3.2–6, at 3–36; 3.2–7, at 3–38 (attached as Appendices A & B to this opinion). Third, should these systems fail to prevent or detect leaks, the DSEIS suggests the mitigation measure of installing a groundwater monitoring system to detect leaks in sufficient time to prevent or remedy any groundwater contamination. DSEIS § 6.2.1, at 6–1.

The FSEIS includes a summary of these main features of the landfill design, which it characterizes as "state of the art," and of mitigation measures. FSEIS § 2.6. In response to comments from the Massachusetts Department of Environmental Protection's Division of Water Pollution Control, the thickness of the proposed secondary liner of clay or bentonite was increased from one to two feet. *Id.* § 2.6.1.1. The FSEIS also suggests that systematic test-ing of the leachate from the lower tier of collection pipes—in order to detect leaks in the primary liner—should be part of the mitigation process. *Id.* § 6.4.2.1. Finally, the FSEIS expanded on the groundwater monitoring, discussing the locations of wells and the frequency of sampling. *Id.* § 6.4.2.2, at 6–6 to –8.

The Towns have two problems with the above mitigation measures. First, they argue that the double-liner design proposed by EPA is not "state of the art," but rather that an "FML/composite liner" design is superior. Second, they fault the EIS for failing to discuss exactly what remedial action will be taken should groundwater contamination occur. In response, the FSEIS has this to say:

It should be emphasized that neither the Final EIR nor this Final SEIS are design documents and that the measures discussed above will be refined and subject to agency review and approval during the design stage. A detailed contingency plan must be prepared prior to construction of the landfill and this plan should identify all the appropriate design features and monitoring plans which will be required to prevent contamination of the site and surrounding areas. The contingency plan should also include a discussion of methods to be implemented by MWRA in the event that remedial action is necessary. In the unlikely event of leachate contamination, MWRA should either remediate or replace public and private water supplies.

*Id.* § 6.4.2.3.

The EIS does not suggest that EPA is wedded to the proposed design should a better one become available, and it also indicates an awareness of the need to provide a contingency plan. On the basis of my review of the EIS, I am satisfied that EPA's mitigation discussion satisfies the standards enunciated in the regulations and in *Methow Valley*.

### J. Agricultural Land

The Towns further challenge the EIS on the ground that it "erroneously

downplays the landfill's irreversible destruction of agricultural land." Statement of Contested Facts ¶ 10. The Towns argue that the EIS flouted NEPA's clear mandate to provide a "detailed statement" on "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C)(v). Moreover, the Towns challenge EPA's conclusion that the irretrievable loss of prime agricultural land is not significant.[8]

The DSEIS gives fairly short shrift to the destruction of agricultural land that would be caused by the use of the Walpole site. It states, "A large portion of the Walpole MCI site is classified as prime farmland or farmland of statewide importance (Figure 4.1–2). Because this land is undeveloped, it represents a potential resource area." DSEIS § 4.1.4.4, at 4–9. It also notes the proximity to the site of "a pasture community, which is mowed yearly for hay." Id. § 4.7.3.2. EPA's conclusion with regard to agricultural uses, however, is that although the landfill operation "would have an adverse impact upon the potential use of the site for agricultural activity," this impact "is not considered to be significant" because "the site is not currently in agricultural use nor are there known plans for such use." Id. § 5.2.2.[9]

The Towns submitted with their comments on the DSEIS a letter from August Schumacher, Jr., Commissioner of the Commonwealth's Department of Food and Agriculture, to John DeVillars, Secretary of the

Executive Office of Environmental Affairs (Apr. 28, 1989), commenting on the draft EIR. Norfolk Comments at 223. In his letter, Commissioner Schumacher states his concern that the proposed landfill "would remove a large parcel of prime/state farmland soils from potential utilization as active agricultural land and would conflict with the governor's Executive Order # 193." In response, the FSEIS "text changes" section incorporates a new § 4.1.2.11 into the DSEIS, describing the provisions of Executive Order No. 193. FSEIS § 7.1, at 7–1. Other than that (and the rather feeble mitigation suggestion of buying a parcel of nearby farmland as a replacement, see supra Part IV.I), the FSEIS does not address agricultural uses, apparently resting on the conclusion in the DSEIS that the loss of currently unused agricultural land would be insignificant. While this ultimate conclusion may be "erroneous," as the Towns suggest, it was not unreasonable. The court's role in NEPA review is to determine whether the agency "has considered the relevant factors and articulated a rational connection between the facts found and the choice made." Baltimore Gas & Elec., 462 U.S. at 105, 103 S.Ct. at 2256. Accordingly, I find that EPA's consideration of the adverse agricultural impact—though not as complete as might be desired—was not arbitrary and capricious.

K. Wetlands

 The Towns insist that a factual dispute also exists concerning whether

---

**8.** The Town of Norfolk's complaint also included a claim that EPA violated the Farmland Protection Policy Act (FPPA), 7 U.S.C. §§ 4201–4209. The FPPA, much like NEPA, requires agencies to evaluate their programs and consider alternatives, but with a specific focus on preventing adverse effects on farmland. Id. § 4202; 7 C.F.R. pt. 658. FPPA, however, explicitly prohibits any private cause of action based on the provisions of the statute. 7 U.S.C. § 4209. Although the NEPA regulations require EPA to apply the criteria promulgated under FPPA in programs to which FPPA would apply, 40 C.F.R. § 6.302(c), and the DSEIS considers the FPPA as part of the overall regulatory setting, DSEIS § 4.1.2.2, I do not understand the NEPA regulations to override Congress's expressed intention not to provide a judicial forum for review of an agency's compliance with

FPPA. Nonetheless, the Towns are correct in asserting that, even if FPPA does not literally apply, EPA still has the duty under NEPA to evaluate the environmental impact on agricultural lands.

**9.** The finding that the site is not currently used for agriculture is inconsistent with the earlier statement that a nearby pasture is mowed yearly for hay. Remembering that an EIS is to be reviewed under a standard of reasonableness, aimed at ensuring good faith compliance, I do not find the apparent disregard of hay mowing to be so significant under the circumstances that it would have altered EPA's findings. See Conservation Law Found., Inc. v. Andrus, 623 F.2d 712, 719 (1st Cir.1979).

EPA considered the impact that the landfill would have on wetlands. Statement of Contested Facts ¶ 11. The Towns believe that the EIS is deficient in concluding that the landfill's drainage impact can be adequately mitigated, in neglecting to comply with Walpole's Wetland Protection By–Law regarding 600 square feet of wetland that will be filled, and in failing to analyze potential water quality degradation on the assumption that the leachate collections system will prevent such degradation. In addition, the Towns argue that a significant new development—the state certification of a vernal pool near the landfill site—requires further analysis. Affidavit of Dean A. Slocum ¶¶ 7–8. These contentions are meritless.

The DSEIS locates and describes all nearby wetlands in detail. DSEIS § 4.7.3.3. This description disclosed, *inter alia*, that the upper pond of "Wetland A" may qualify as a vernal pool under the Massachusetts wetland protection statute, Mass. Gen. Laws ch. 131, §§ 40–40A.[10] DSEIS § 4.7.3.3, at 4–158. The DSEIS further notes that slight modifications to the landfill footprint design will have to be made in order not to disturb Wetlands A and D. *Id.* § 5.8.2.1, at 5–93. It also notes that landfill construction will "result in loss of the small (600–square–foot) isolated wet area." *Id.*

With respect to drainage impact, the DSEIS calls for "[m]itigation measures such as runoff catchments and erosion control [to] further reduce the impacts on both wetlands A and D." *Id.* In response to comments on the effects of drainage and runoff, the FSEIS concludes,

Impacts to the wetlands due to recharge (drainage and runoff) resulting from landfill construction would be minimal. The cell system of landfill opera-

tion will assure that only one fifth of the landfill footprint would be excavated at one time. Temporary ditches, berms, and dikes around the open cell will divert runoff around the open cell to simulate the original flow pattern.... The mitigation section of this Final SEIS (Section 6.4.2) describes the on-site drainage controls that should be specified during landfill design.

FSEIS § 5.7.1. While the Towns may disagree with EPA's conclusions, I am satisfied that the conclusions are not arbitrary and capricious and that they adequately took the Towns' concerns into account.

EPA's failure to discuss compliance with the Town by-law applicable to the 600–square–foot wetland area that will be filled is excusable given the facts that (1) MWRA is a statewide agency, the exercise of whose powers "shall be deemed to be the performance of an essential public function," Mass.Gen.Laws ch. 92 App., § 1–3(a), and (2) that "an entity or agency created by the Massachusetts Legislature is immune from municipal zoning regulations (absent statutory provision to the contrary) at least in so far as that entity or agency is performing an essential government function." *County Comm'rs v. Conservation Comm'n*, 380 Mass. 706, 710, 405 N.E.2d 637 (1980).[11]

The record belies the charge that the EIS failed to analyze potential water quality degradation. The DSEIS contains a detailed analysis of potential water pollution to the Stop River resulting from a leak in the landfill liner, concluding that a leak would not significantly change existing conditions. DSEIS § 5.5.2.3, at 5–56. The DSEIS also includes a paragraph on mitigation measures to control surface water runoff. *Id.* The FSEIS, referring to the revised study of groundwater supplies in the

---

**10.** Vernal pools located within wetland resource areas—as well as a 100–foot "buffer zone" around such pools—are protected. Mass.Regs. Code tit. 310, §§ 10.02(2)(b), 10.04 (1989).

**11.** The Towns also stress that the 600–square–foot area is of "critical importance" because it cannot be filled without a permit from the U.S. Army Corps of Engineers. This permit (No. 199000033) was granted to MWRA on February

11, 1991, after the Towns' opposition was filed. At one point, the Towns' brief confuses this 600–square–foot area with the certified vernal pool. Plaintiffs' Brief at 106. This is erroneous, however, as evidenced by the plaintiffs' own submissions. Affidavit of Dean A. Slocum, Ex. A, at 1, 5 (locating vernal pool within Wetland A; labelling 600–square–foot area as "Wetland E").

event of a landfill leak, states that "even if a leak occurred the contaminant level would be below water quality criteria and thus no impacts on aquatic life in wetlands are anticipated." FSEIS § 5.7.1. Thus, the EIS adequately analyzes water quality degradation.

Finally, the so-called new development of vernal pool certification does not require revision of the EIS or the filing of a supplement because the EIS was compiled on the assumption that the upper pond of Wetland A *was* a vernal pool. The DSEIS states, "Slight alterations to the footprint design could minimize impacts to these wetland resources and ensure that the landfill is at least 100 feet from the upper pond." DSEIS § 5.8.2.1, at 5–93. This statement, as well as the first paragraph of FSEIS § 5.7.1, clearly indicates that the EIS took the Massachusetts vernal-pool buffer-zone regulation, *see supra* note 10, into account.

### L. Hazardous Waste Analysis

The Towns claim that EPA erroneously applied the implementing regulations for the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. §§ 6901–6992k; 40 C.F.R. pt. 261 (1990), and the similar provisions of the Massachusetts Hazardous Waste Management Act, as amended, Mass. Gen. Laws ch. 21C, §§ 1–30; Mass.Regs.Code tit. 310, pt. 30 (1991), in determining that the untreated sludge that might be disposed at the landfill on an emergency basis is not hazardous waste as defined by these statutes. Statement of Contested Facts ¶ 12. In reality, this is not a factual dispute; rather, this dispute centers around a question of law regarding the application of the regulations.

Under both the federal and state definitions of hazardous waste, which are virtually identical, a substance is considered hazardous if it is either listed in the regulations, 40 C.F.R. §§ 261.31–.33; Mass.Regs. Code tit. 310, §§ 30.130–.136, or if it exhibits the characteristics of hazardous waste. 40 C.F.R. §§ 261.20–.24; Mass.Regs.Code tit. 310, §§ 30.120–.125B. EPA, after conducting appropriate toxicity analyses, de-termined that the sludge did not exhibit the characteristics of hazardous waste. DSEIS § 3.1.1.2, at 3–6; FSEIS § 5.5.2, at 5–17. This conclusion in not disputed.

The legal dispute concerns EPA's determination that "sludge from a waste-water treatment plant" is not hazardous waste because it is not listed in the regulations, even though it may contain substances that are. The Towns contend that the residuals must be classified as hazardous waste if they contain *any* of the substances listed in 40 C.F.R. §§ 261.31–.33 or Mass.Regs.Code tit. 310, §§ 30.130–.136, regardless of the concentrations of these substances in the residuals.

A review of the regulations supports EPA's position. The lists of hazardous wastes include wastes from "non-specific sources," wastes from "specific sources," and discarded chemical products. The substances listed in the first two categories are expressed in descriptive terms, such as no. F012, "[q]uenching waste water treatment sludges from metal heat treating operations where cyanides are used in the process," 40 C.F.R. § 261.31, or no. K117, "[w]astewater from reactor vent gas scrubber in the production of ethylene dibromide via bromination of ethene." *Id.* § 261.32. Sludge from a wastewater treatment plant is not among these. The Towns point out that some of the indicator chemicals and metals found in digested sludge, *see* DSEIS Table 3.1–5, at 3–8 to –9, are listed in § 261.33. Section 261.33, however, refers to these wastes when released in pure or off-specification batches, or when used in particular processes listed in the regulations. This is not the case here. Moreover, when EPA published the final rule in the Federal Register, it commented in the "interpretive issues" section of the ruling, "Solid wastes which simply contain one of the chemicals listed in § 261.33 are not thereby hazardous. Where EPA intends to list such wastes, it will do so by listing them in §§ 261.31 and 261.32." 45 Fed. Reg. 78,532, 78,540 (1980). Thus, the EIS applied the regulations correctly in establishing that the sludge that might have to

be landfilled on an emergency basis is not hazardous waste.

### M. Landfill Capacity

The plaintiffs state that the EIS is also deficient because it inadequately calculated the size—and thus the capacity—of the landfill. Moreover, they claim that EPA's estimates of the number of years it will take to reach capacity is seriously flawed because of overly optimistic assumptions about the marketability of pelletized sludge. Statement of Contested Facts ¶ 13.

The Towns argue that EPA overestimated the size of the landfill footprint by failing to take into account state solid-waste facility regulations, which would require a 500–foot setback from the nearby prisons, residential dwellings, and private wells, and also by failing to take into account the Towns' delineations of the borders of the sole-source aquifer and prison-well recharge areas. The capacity was overestimated, the Towns charge, because EPA did not account for changes in landfill design that might increase the thickness of the liners and correspondingly decrease capacity.

The EIS discusses landfill size and capacity in depth. The DSEIS notes that the primary purpose of the landfill will be disposal of grit and screenings, but that "available landfill capacity must be reserved for emergency sludge landfilling (in case of mechanical breakdown of sludge-processing facilities)" as well as for dewatered sludge in the event that MWRA is unable to market some or all of its sludge products. DSEIS § 5.1.5. Thus, the DSEIS estimates the amount of landfill space available for sludge after considering "grit and screenings, cap, cover, liner, and six months of emergency sludge disposal." *Id.* § 5.1.5.1, at 5–4. Its unhappy, but frank, conclusion is that if "MWRA is not able to market at least 60 percent of its sludge product, the alternative Walpole MCI landfill would not have adequate capacity ... and either an incinerator or a second landfill would be required." *Id.* at

5–5. The conclusions in the FSEIS were similar. FSEIS § 5.3.1.

 With respect to the applicability of the state solid-waste facility regulations, the FSEIS notes that state law creates a distinction between solid waste and waste-water residuals, each being subject to different regulations. *Id.* § 5.5.1, at 5–15 to –16. The FSEIS also explains the reasons that state law differentiates between the two. *Id.* at 5–16. EPA's decision to work on this assumption regarding applicable law was reasonable. The Towns have filed an action in state court for a declaratory judgment that the solid-waste regulations apply. Plaintiffs' Brief at 40 n. 19. Nonetheless, the EIS cannot be found deficient under NEPA for reasonably operating under the assumption that the law means what it says.

As for the Towns' attempt to resurrect their arguments regarding threats to groundwater supplies, I will rest on the conclusions I reached, *supra* Part IV.B, that EPA's considerations of these issues was adequate under NEPA.

As to possible decreases in landfill capacity because of changes in design, the ROD acting upon the EIS explicitly recognized this possibility: "It should be noted that all of the capacity figures cited by MWRA and EPA [in the FSEIS] are estimates, based on the information available to date. We fully expect that these numbers will be refined during final design." ROD app. at A–6. Taken as a whole, I find that EPA's discussion of the estimated capacity of the landfill was not arbitrary and capricious nor undertaken in bad faith.

The Towns' claim regarding the marketing of processed sludge is basically that EPA arbitrarily and capriciously assumed that MWRA would be able to sell its sludge. A review of the EIS, however, indicates that EPA in fact took the "hard look" that NEPA requires. The EIS is openly critical and concerned about the "beneficial reuse" of sludge and suggested steps that MWRA could take to achieve 100 percent reuse. *See, e.g.,* DSEIS § 6.3; FSEIS § 6.2. I therefore reject the Towns'

objections to the EIS's consideration of landfill dimensions and capacity.

### N. Transportation

 The Towns' fourteenth asserted issue of disputed fact is that the EIS gives "inadequate consideration to transportation access to the site." Statement of Contested Facts ¶ 14. The EIS calls for transporting residuals to the site by truck along local surface roads through residential areas, near churches and schools, and across busy intersections, and the Towns are concerned that this plan will create safety hazards.

The EIS, however, discusses this issue in some detail. See, e.g., DSEIS § 4.2.4. EPA studied the transportation implications of four different scenarios, including a worst-case scenario and three less extreme scenarios, and concluded that the worst-case scenario would have a significant adverse effect along the "Winter Street Route" but not along the "Pine Street Route." Id. § 5.3.4. Mitigation measures were suggested. Id. § 6.2.1, at 6–2. Responding to comments, the FSEIS revisited the transportation issues. FSEIS §§ 2.4, 5.10.1.

NEPA does not require an agency to eliminate all adverse effects of a proposed action; it simply is intended to put the adverse effects before the agency making the decisions. I find that the EIS's treatment of the transportation issue was reasonable and in full compliance with the provisions of NEPA.

### O. Walpole Water and Sewer Systems

 Finally, the Towns assert that the EIS inadequately considered the impact of landfill construction and operation on the Town of Walpole's water and sewer systems. Statement of Contested Facts ¶ 15.

The DSEIS originally called for water to be brought to the landfill from the Walpole municipal water supply and for leachate and wastewater to be piped into the municipal sewer system. DSEIS § 3.4.1, at 3–45 to –49. The FSEIS offers improvements to the original plan, including the construction of water supply and sewage storage tanks to enable the landfill to receive water and discharge sewage at non-peak hours. FSEIS §§ 2.5.1–.2. The FSEIS also suggests alternative measures of transporting water and sewage to and from the nearest MWRA facilities at the border of the Towns of Norwood and Walpole by truck, or of hooking up to the MWRA system by dedicated water and sewer lines. Id. §§ 2.5.2, 5.15. EPA's brief response does not indicate that they paid a great deal of attention to this matter; however, the EIS reasonably considered the issue and proposed reasonable mitigating and alternative plans. NEPA was satisfied.

### V

Having thoroughly reviewed the DSEIS, the FSEIS, the administrative record, and the Towns' affidavits and exhibits, I conclude that EPA adequately complied with the letter and spirit of NEPA and its corresponding regulations. While the Towns have focused on the trees and discovered a few diseased branches, my review of their objections convinces me of the essential soundness of the trees as well as the forest. The EIS was procedurally reasonable, discloses all environmental impacts, responds to comments, and arrives at conclusions that are neither arbitrary nor capricious. Nor have the Towns established any genuine issue of fact to indicate that the EIS was undertaken in bad faith. Summary judgment is ALLOWED in favor of the defendants on all counts.

SO ORDERED.

APPENDIX A

FIGURE 3.2-6. SCHEMATIC OF CAP AND LINER SYSTEMS

APPENDIX B

FIGURE 3.2-7. SCHEMATIC OF CELL DEVELOPMENT

SOURCE: MWRA, RMFP, LANDFILL, I, 1988