**GRAZING FIELDS FARM et al.,**
**Plaintiffs, Appellants,**

v.

**Neil GOLDSCHMIDT et al.,**
**Defendants, Appellees.**

**No. 80–1076.**

United States Court of Appeals,
First Circuit.

Argued April 8, 1980.

Decided June 25, 1980.

Gregor I. McGregor, Boston, Mass., for plaintiffs, appellants.

Marianne B. Bowler, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for Federal defendant, appellee.

William A. Brown, Sp. Asst. Atty. Gen., Boston, Mass., for State defendants, appellees.

Douglas I. Foy, Boston, Mass., and Frederick Small, Cambridge, Mass., on brief for Conservation Law Foundation of New England, Inc., amicus curiae.

Michael P. Last, Susan M. Cooke, and Harlan M. Doliner, Boston, Mass., on brief, for Environmental Committee of The Boston Bar Association, amicus curiae.

Before COFFIN, Chief Judge, ALDRICH and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

This appeal raises an elementary but important question about the requirement contained in the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332 (2)(C)(iii), that a federal agency must prepare a detailed statement discussing alternatives to proposed agency action. The question is whether pertinent information found in the administrative record, but not incorporated in an environmental impact statement (EIS), may satisfy this statutory requirement in whole or in part. We hold that it cannot and reverse the contrary decision of the district court.

For purposes of this appeal, we can content ourselves with a brief statement of the facts. The need for highway expansion in the Buzzard's Bay area of Massachusetts has been evident for more than twenty years. Traffic congestion on the approaches to the Cape Cod Canal is severe; holiday motorists experience substantial delays in traveling to Cape Cod, and the town of Bourne is inundated with automobiles. Consultation among the Federal Highway Administration (FHWA), the Massachusetts Department of Public Works (DPW), and

local officials resulted in a plan to extend Massachusetts Route 25 from its present terminus in Wareham to the Bourne Bridge crossing the canal, thereby bypassing the town of Bourne. The alignment chosen traverses Grazing Fields Farm, a 900 acre tract containing farmland, a wildlife sanctuary and a riding school. This alignment was chosen over two others, which did not impinge on the farm, after a public hearing in 1968. Further public meetings to discuss the environmental effect of the proposed highway were held at Bourne in 1972 and 1974. At the latter hearing, officials received comments on the Draft Environmental Impact Statement.

The family which owns Grazing Fields Farm, the Ingersolls, has, at least since 1975, attempted to convince federal and state officials that a different route across its property would be preferable because it would protect more fully the unique resources of the farm, while providing an adequate alignment for the highway. More specifically, the Ingersolls have contended that adoption of their suggested alternative, referred to by the parties as the upland alignment, would avoid serious interference with an 11 acre wetland, circumvent entirely the cultivated farmland, and better shelter these areas from road noise.

FHWA responded to this suggestion by directing its retained consulting engineering firm, C. E. Maguire, Inc., to study the proposed alternative. The Maguire study noted several advantages to the upland route, but found several disadvantages as well; namely, it would add nearly one half mile to the route and increase the angle of road curves. The increased length of the highway would increase both construction and user costs. These factors, along with apparent concern about the impact of the upland route on water well fields, led FHWA and DPW to reject the alternative alignment in March, 1976. The Ingersolls objected to this conclusion, and a meeting was held at the end of the month where federal, state and local officials, and the Ingersolls' representatives discussed further the upland alternative and possible compromises. At the close of the meeting, DPW

reiterated its intention to proceed with the original route.

In April, 1977, DPW submitted the final EIS to FHWA for approval. The Ingersolls, still dissatisfied with the official decision, submitted, in September, 1977, their own expert's favorable analysis of the suggested alternative, which is referred to as the Laird report. Although neither DPW nor FHWA was persuaded by the Laird report, their administrative responses to it differed. The Massachusetts Secretary of Environmental Affairs directed DPW to prepare an Addendum to the final EIS considering generally the upland alignment and responding specifically to the Laird report. The state Addendum, which was published in August, 1978, concluded that the original route was preferable. While the Addendum satisfied Commonwealth law, it never became part of the federal EIS and, therefore, never received the wide circulation through the federal government and consequent comment that a federal supplemental EIS receives. *See, e. g.,* 23 C.F.R. § 771.15 (1976) (FHWA).

FHWA, on the other hand, responded to the Laird report in a letter to its author in October, 1977, which merely repeated earlier objections to the upland alignment. The letter did not address the specific criticisms made in the new report. In February, 1978, FHWA approved the final EIS. Discussion of the proposed alternative route was contained in an appendix as a response to a comment by the Ingersolls' lawyer:

"Federal and State Officials reviewed an alternative alignment to proposed Route 25/28 with representatives of the Buzzards Bay Water District and Hope G. Ingersoll on March 31, 1976. This alternative was proposed because of its lesser impact to Grazing Fields Farm. However, due to its impact on nearby well fields, existing power lines, and extra takings required for the right of way, State and Federal officials rejected this alignment. By emphasizing the importance of the consensus expressed by the public at the last hearing in 1974, State

and Federal Officials made clear their position to follow through with the alignment shown in the Draft Environmental Impact Statement."

Also included as a separate appendix was a description of the environmental and cultural attributes of Grazing Fields Farm, written by Tudor Ingersoll, which argued generally that public takings had damaged the farm.

The Ingersolls were not satisfied with the discussion of the upland alternative in the final EIS,[1] and on August 31, 1979, joined by other interested parties, filed a complaint in the district court seeking a preliminary injunction and declaratory relief under NEPA and other federal statutes and regulations. FHWA and DPW filed answers in the autumn. A motion by plaintiffs for a preliminary injunction was superceded by cross-motions for summary judgment. After a hearing, the district court granted summary judgment to the state and federal defendants. The district court subsequently granted and then dissolved a stay pending appeal.

Our primary concern in this appeal is with the grounds the district court relied on in granting defendants' motion for summary judgment. After setting forth the pertinent facts and procedural history, the court summarized the principal contentions of the parties. Plaintiffs were seen to argue that the failure of FHWA to discuss the upland alternative with sufficient detail in the EIS rendered that EIS defective under NEPA. The court characterized plaintiffs' goal as merely to postpone construction of the highway until a supplemental EIS was prepared, which would discuss in appropriate detail the matters contained in the state

Addendum. The defendants argued that review of the entire administrative record indicated that FHWA had thoroughly considered the Ingerolls' proposed alternative in good faith and had thereby complied with the goals of NEPA and rendered a decision neither arbitrary nor capricious within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706. The district court, relying in part on *Commonwealth of Massachusetts v. Andrus*, 594 F.2d 872 (1st Cir. 1979), accepted the defendants' characterization of the issue:

"The question here is whether the decision to proceed with the construction of the selected alignment is supported by an adequate environmental impact statement *and* the administrative record. Stated differently, the question is whether the environmental impact statement and other documents associated with the decision to go forward with the selected alignment are deficient." (Emphasis in original.)

After then reviewing the administrative record, the court concluded that FHWA had carefully and thoroughly evaluated the upland alternative. It concluded that the EIS and the administrative record had satisfied all the purposes of an environmental impact statement discussed in *Silva v. Lynn*, 482 F.2d 1282 (1st Cir. 1973). The court reasoned that this manner of compliance sufficed because: "To require a supplemental EIS be generated by this case and on the record would be a needless and meaningless gesture and would simply delay the project."

 The district court's decision, we conclude, was in violation of one of NEPA's requirements. There are two aspects to a

---

1. The Ingersolls were not the only parties who believed that the discussion of the upland alternative in the final EIS was too summary. The Environmental Protection Agency wrote to FHWA in May, 1979. EPA expressed concern that concerned federal agencies had not been given an opportunity to review and offer comments on the Laird report and the state Addendum, suggested that a supplemental EIS should be prepared and gave its opinion that the final EIS's limited discussion of the upland alternative rendered it deficient under NEPA. EPA

has adhered to this position, as is evidenced by its statement in a February, 1980, letter to FHWA:

"EPA's position on this matter remains the same as it was stated in my letter of May 14, 1979. In our opinion, the decision by FHWA not to issue the Addendum in the form of a supplemental EIS and not to circulate it for review by all appropriate federal agencies fails to comply with the requirements of the National Environmental Policy Act."

court's review of an agency decision subject to the requirements of NEPA. First, the court makes a substantive review of the agency's action to determine if such action is arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. § 706. This substantive review, although conducted on the basis of the entire administrative record, is quite narrow in scope. The court should only assure itself that the agency has given good faith consideration to the environmental consequences of its actions and should not pass judgment on the balance struck by the agency among competing concerns. *Stryker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980) (per curiam).[2]

■ Second, a reviewing court must assess the agency's compliance with the duties NEPA places upon it. These duties are "essentially procedural". *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). The primary procedural mechanism embodied in NEPA is the requirement that an agency prepare "a detailed statement" discussing, inter alia, "alternatives to the proposed action", 42 U.S.C. § 4332(2)(C). *See Monroe County Preservation Council, Inc. v. Volpe*, 472 F.2d 693, 699–700 (2d Cir. 1972) (discussion of alternatives the "linchpin" of an environmental impact statement). Requiring an agency to discuss alternatives within the EIS serves numerous goals. The detailed statement aids a reviewing court to ascertain whether the agency has given the good faith consideration to environmental concerns discussed above, provides environmental information to the public and to interested departments of government, and prevents stubborn problems or significant criticism from being shielded from internal and external scrutiny. *Silva v. Lynn, supra*, 482 F.2d at 1284–85.

■ The defendants' position in this case is that they have, regardless of the formal sufficiency of the EIS, achieved these goals. They argue that FHWA's procurement of a study of the feasibility of the upland alternative, its conducting of public hearings, and its written and oral communications with plaintiffs demonstrate that FHWA made an informed, good faith decision to reject the proposed alternative alignment. Even accepting defendants' evaluation of their performance as accurate, their legal argument overlooks the preeminent fact that Congress has specified the procedural means appropriate to vindicate the substantive goals of NEPA. Section 4332(2)(C) does not merely mandate that a federal agency make an informed decision involving environmental concerns, but orders the agency to prepare a detailed statement discussing the environmental issues. We find no indication in the statute that Congress contemplated that studies or memoranda contained in the administrative record, but not incorporated in any way into an EIS, can bring into compliance with NEPA an EIS that by itself is inadequate.

Courts which have considered this issue in other contexts have come to the same conclusion. In *I–291 Why? Association v. Burns*, 372 F.Supp. 233 (D.Conn.1974), the court concluded that post-EIS studies by a local employee of FHWA could not save a defective EIS because the studies were not circulated to the Washington office of FHWA nor to other interested agencies,

---

**2.** The district court seems to have misconstrued the breadth of *Stryker's Bay*. Examination of the transcript of the hearing on the cross-motions for summary judgment suggests that the court read the Supreme Court's per curiam opinion as radically restricting the scope of its review of the agency's compliance with NEPA. We read *Stryker's Bay* to govern only a court's *substantive* review under the Administrative Procedure Act and to reassert the familiar rule that a court may not second guess the wisdom of the agency's policy choice.

No issue relating to the *procedural* requirements of NEPA was presented to or decided by the Court. The error identified in the lower court's decision in *Stryker's Bay* was that it had looked to NEPA for substantive standards by which to evaluate the agency's decision. 444 U.S. at 227, 100 S.Ct. at 499. The error we find in the district court's decision in this case is that it looked to these principles of substantive review to gauge the standards for procedural compliance with NEPA. *See infra*.

such as EPA and the Council on Environmental Quality. The Court commented: "The circulation and review requirements are critical features of NEPA's effort to insure informed decision making by providing procedural inputs for all responsible points of view on the environmental consequences of a proposed major federal action." 372 F.Supp. at 223.

On appeal, the Second Circuit affirmed the district court, stating: "These studies could not cure these particular inadequacies because they were not circulated for review and comment in accordance with procedures established to comply with NEPA." 517 F.2d 1077, 1081 (1975). *See also Appalachian Mountain Club v. Brinegar*, 394 F.Supp. 105, 122 (D.N.H.1975) (supplemental information not circulated in the same manner as a draft EIS cannot validate an otherwise deficient draft EIS).

Defendants offer no pertinent authority for their position that the administrative record may partially satisfy NEPA's requirement for a detailed statement, and we have discovered none. *Commonwealth of Massachusetts v. Andrus*, 594 F.2d 872 (1st Cir. 1979), does not support defendants' claim. The court there noted that the district court had found that the "environmental impact statement and other documents associated with the decision to go forward" were deficient, but did not itself embrace that standard of review. Examination of subsequent portions of the opinion reveals that the court focused only on the contents of the EIS and applicable law to determine if the requirements of NEPA had been satisfied. *See id.* at 884–87.

While the clarity of the statute and prior judicial decisions provide ample guidance for our decision, we also find persuasive policy reasons for holding that an administrative record cannot save an EIS that otherwise fails to satisfy NEPA. In short, the requirement of a detailed statement is not a pointless technicality even when the agency has in fact considered environmental factors in good faith; intra-agency consideration lacks the benefits secured by discussion in the EIS. NEPA seeks to achieve substantive environmental improvement by requiring full disclosure of the basis for agency action. *See Essex County Preservation Ass'n v. Campbell*, 399 F.Supp. 208, 216 (D.Mass.1975), aff'd, 536 F.2d 956 (1st Cir. 1976). NEPA contemplates that disclosure be made not only to parties whose direct interest in a parcel of land will be affected by an agency's action, but to other departments of government and the public at large. In the case at bar, for example, EPA was concerned with the adequacy of the FHWA's evaluation of the proposed alternative route, but arguably could not meaningfully participate in the evaluation because much of the data supporting FHWA's decision was not circulated for comment. FHWA's letter responding to EPA's concerns, in turn, was not referred to in the EIS, thereby hindering public scrutiny of FHWA's course of decision-making.

Public oversight of government action that affects the quality of the environment has flourished under NEPA. *See* Friesma & Culhane, *Social Impacts, Politics and the Environmental Impact Statement Process*, 16 Nat. Resources J. 339, 348–56 (1976). The logic of the district court's approach runs counter to this socially useful scrutiny because it would place the burden of combing the administrative record, which is often scattered through the files of numerous federal and state agencies, on interested members of the public. NEPA expressly places the burden of compiling information on the agency so that the public and interested government departments can conveniently monitor and criticize the agency's action. The now traditional avenue of independent comment on decision-making by public interest organizations would be narrowed if interested parties did not have presented in the EIS the analysis and data supporting an agency's decision. The district court's approach impeding this scrutiny would hinder at least two of the purposes of an environmental impact statement identified in *Silva v. Lynn, supra*, ; it would hamper the flow of information to the public by making more difficult the endeavors of watchdogs who could reasonably be expected to publicize the environ-

mental issues present, and would tend to mute those most likely to identify problems and criticize decisions. The propagation of information and sustenance of debate can both improve agency evaluation of a particular, contemplated project, and nourish broad-based consideration of long term questions of the balance to be struck between development and preservation and the means to effect that balance.

■■■ Our holding does not mean that the administrative record should play no part in the evaluation of the adequacy of the discussion of alternatives in an environmental impact statement. The degree to which any alternative must be discussed must be measured by a "rule of reason". *Commonwealth of Massachusetts v. Andrus, supra,* 594 F.2d at 884. Courts cannot force agencies to include within an EIS alternatives too fanciful or hypothetical. *Vermont Yankee Nuclear Power Corp. v. NRDC, supra,* 435 U.S. at 551, 98 S.Ct. at 1215, nor can they require a degree of detail too exacting to be realized, *County of Suffolk v. Secretary of the Interior,* 562 F.2d 1368, 1377–78 (2d Cir. 1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978).

Study of the administrative record by the court helps to assess the degree of discussion any particular alternative deserves, based on the alternative's feasibility and the stage in the decision-making process it is brought to the attention of the agency. *See Vermont Yankee Nuclear Power Corp. v. NRDC, supra,* 435 U.S. at 549–55, 98 S.Ct. at 1214–1217. This use of the record to inform a court's judgment about the adequacy of an EIS must be distinguished from our holding today that agency consideration of alternatives evidenced by the record cannot replace the NEPA mandated discussion of alternatives in the environmental impact statement itself.[3] In other words, the district court can use the administrative record to set the standard for how much discussion within the EIS a particular alternative merits, but cannot deem the unincorporated record to satisfy that standard.[4]

■■■ In the case before us, the district court has not yet ruled on the question whether the discussion of the upland alternative in the EIS satisfies the requirements of 42 U.S.C. § 4332(2)(C).[5] We conclude

3. We add for the sake of completeness that vague references within the EIS to unspecified, unincorporated sections of the record cannot satisfy NEPA's demand that the EIS itself contain discussion of alternatives.

4. The application of this rule is demonstrated by our *per curiam* decision in *Conservation Law Foundation v. Andrus,* 617 F.2d 296 (1979). In a prior opinion we had indicated that the district court should consider whether an environmental impact statement should discuss the alternative of designating portions of the Outer Continental Shelf as marine sanctuaries under the Marine Sanctuaries Act, 16 U.S.C. §§ 1431–34. *Commonwealth of Massachusetts v. Andrus, supra,* 594 F.2d at 884–86. The case returned to this court after the district court denied a preliminary injunction because it found no clear deficiencies in the Secretary of the Interior's Supplemental EIS; we were asked to enjoin a sale of oil and gas leases pending appeal. Although we noted that that discussion in the Supplemental EIS of the alternative of designating the area a marine sanctuary was "pedestrian", we refused to find that the district court was clearly erroneous in finding the discussion adequate. We found in the administrative record that the National Oceanic and Atmospheric Administration (NOAA) had

withdrawn the disputed area from candidacy for designation as a marine sanctuary, *see* 15 C.F.R. § 922 (1979), rendering the alternative largely hypothetical. We held, "Especially in light of the fact that NOAA has withdrawn Georges Bank as an active candidate for marine sanctuary designation, we are not persuaded that the Secretary of the Interior's formal analysis was so inadequate, taken in this context, as to violate NEPA." *Conservation Law Foundation v. Andrus, supra,* at 299. Thus, our examination of the administrative record informed our judgment as to how extensively the proposed alternative had to be discussed within the EIS itself.

5. DPW asserted in its brief that the district court did rule that the EIS itself adequately discussed the upland alternative when the court noted that although the EIS "does not deal expansively with the alternatives", it "provides ample notice of the alternatives". Examination of the district court's opinion makes it plain that the court was stating that cumulative discussion in the EIS and the administrative record satisfied NEPA. Providing notice of what alternatives were considered is only one of the purposes of an EIS. *See Silva v. Lynn, supra,* 482 F.2d at 1284–85.

that the case should be remanded to the district court for consideration of this question under the proper legal standard. "As an appellate court, we prefer not to rule on questions of this complexity without a lower court decision and without a more adequate presentation before us." *Commonwealth of Massachusetts v. Andrus, supra,* 594 F.2d at 886. Little, if any prejudice to the government would seem to result from this delay in finally settling the issue since no injunction now prevents progress on construction. The district court is in a better position to examine the sufficiency of the EIS and to design such temporary or other relief, if any, as may be found appropriate with aid, if necessary, of further briefs or hearings. Nothing contained in this opinion should be taken as expressing a view on the adequacy of the EIS itself under NEPA.

Our reversal of the grant of summary judgment makes it unnecessary for us to consider appellants' other arguments.

*Reversed and remanded for further proceedings not inconsistent with this opinion.*