CENTER FOR BIOLOGICAL DIVERSITY, a non-profit organization; Sierra Club, a non-profit corporation, Plaintiffs–Appellants,

v.

UNITED STATES FOREST SERVICE, a Federal agency; Eleanor Towns, in her capacity as Regional Forester, Region 3, U.S. Forest Service; Dale Bosworth, in his official capacity as the Chief of the United States Forest Service, Defendants–Appellees.

No. 02–16481.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 15, 2003.

Filed Nov. 18, 2003.

Michael R. Lozeau, Karli E. Sager, Deborah A. Sivas, Earthjustice, Stanford, CA; Howard M. Shanker, Phoenix, AZ, for the plaintiffs-appellants.

Kelly A. Johnson, Acting Assistant Attorney General; Ellen J. Durkee, Andrew A. Smith, Susan Pacholski, Attorneys, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, for the defendants-appellees.

Before: KLEINFELD, WARDLAW, Circuit Judges, and POGUE, Judge.*

## OPINION

POGUE, Judge:

Appellants challenge the district court's grant of summary judgment to Appellees, arguing that Appellees' final environmental impact statement ("Final EIS" or "final statement" or "final impact statement") violates the National Environmental Policy Act ("NEPA" or "the Act"), 42 U.S.C. § 4332(2)(C) (1994), and 40 C.F.R. § 1502.9(b) (1996) of the Act's implementing regulations. Appellants' claim derives from scientific opposition to Appellees' conclusion that northern goshawks[1] are habitat generalists, upon which conclusion the final statement's management recommendations rest. We have jurisdiction pursuant to 28 U.S.C. § 1291 (1994). Be-

cause the Final EIS fails to disclose responsible scientific opposition to the conclusion upon which it is based, as required by 40 C.F.R. § 1502.9(b), we reverse and remand.

## I. BACKGROUND

In light of rising concern over the impact of logging practices on the viability of the northern goshawk in the Southwestern Region of the United States,[2] on October 1, 1990, the Regional Forester of the United States Forest Service (the "Service" or "Forest Service") created the Northern Goshawk Scientific Committee (the "Committee" or "Scientific Committee"), to review the hawk's habitat management needs.[3] Forest Serv., U.S. Dep't of Agric., *Final Environmental Impact Statement: For Amendment of Forest Plans*, 4 Rec. Ex. at 951 (1995); Draft EIS, 3 Rec. Ex. at 596.

On June 24, 1992, the Service published notice of its intent to prepare an environ-

---

\* Honorable Donald C. Pogue, United States Court of International Trade Judge, sitting by designation.

1. The northern goshawk, one of the nation's largest hawks, was classified as a "sensitive species" by the Forest Service in 1982. Forest Serv., U.S. Dep't of Agric., *Draft Environmental Impact Statement: Amendment of Forest Plans (Proposed)*, 3 Rec. Ex. at 596 (1994) ("Draft EIS" or "draft statement" or "draft impact statement"). The goshawk has short rounded wings and a long narrow tail, which enable the bird to maneuver through dense canopied forest. Ariz. Game and Fish Dep't, *Review of U.S. Forest Service Strategy for Managing Northern Goshawk Habitat in the Southwestern United States*, 2 Rec. Ex. at 230 (1993) ("AGFD's Review Paper").

2. The Southwestern Region contains the National Forest System lands within the States of Arizona and New Mexico, and includes the Apache–Sitgreaves, Carson, Cibola, Coconino, Coronado, Gila, Kaibab, Lincoln, Prescott, Santa Fe and Tonto National Forests. 36 C.F.R. § 200.2(e).

3. On February 25, 1991, the Forest Service published a Notice of Intent to prepare an environmental impact statement specifically for the Kaibab National Forest. *Timber Resource Reanalysis—Kaibab National Forest*, 56 Fed.Reg. 7,659, 7,659 (Dep't Agric. Feb. 25, 1991) (notice of intent to prepare an environmental impact statement). The Kaibab amendment process was merged with the entire Southwestern Region's amendment process, as a result of public comments on March 20, 1995. *Sout[h]western Region, Arizona: Timber Resource Analysis—Kaibab National Forest*, 60 Fed.Reg. 14,719, 14,719 (Dep't Agric. Mar. 20, 1995) (cancellation of notice of intent to prepare an environmental impact statement); *Southwestern Region, Arizona, New Mexico, West Texas, and Oklahoma; Amendment of National Forest Plans in the Southwestern Region to Include Guidelines for Management of Habitat for the Mexican Spotted Owl and Northern Goshawk*, 60 Fed.Reg. 14,719, 14,719 (Dep't Agric. Mar. 20, 1995) (revised notice of intent to prepare an environmental impact statement). Therefore, we do not discuss the draft Kaibab National Forest statement separately.

mental impact statement amending forest land and management plans in the Southwestern Region to incorporate guidelines for habitat management of the northern goshawk. *Southwestern Region, Arizona, New Mexico, West Texas, and Oklahoma; Amendment of National Forest Management Plans in the Southwestern Region to Include Guidelines for Management of Habitat for the Mexican Spotted Owl and Northern Goshawks*, 57 Fed.Reg. 28,171, 28,171 (Dep't Agric. June 24, 1992) (notice of intent to prepare an environmental impact statement).[4]

In August 1992, the Committee published its report, which concluded that the northern goshawk was a habitat generalist occupying a mosaic of forest types, forest ages, structural conditions, and successional stages in their daily foraging movements throughout the Southwestern Region's coniferous, deciduous, and mixed forests. Richard T. Reynolds et. al., U.S. Dep't of Agric., *Management Recommendations for the Northern Goshawk in the Southwestern United States*, 1 Rec. Ex. at 93, 95, 104 (1992) (*"MRNG "*). The report also found that the goshawk seldom used young, dense forests because those forests contain too few large trees in which the goshawk can nest, and insufficient space "in and below the canopy to facilitate flight and capture of prey." *Id.* at 104. On the basis of these conclusions, the report set forth recommendations describing the desired balance of forest age classes, or vegetation structural stages ("VSS"),[5] for the nest area, post-fledging family area, and foraging area of the goshawks' home range. *Id.* at 115–124. The recommendations were derived from the "information available on how foraging goshawks use

their habitat." *Id.* at 98. In particular, the report recommended that a mosaic of vegetation stages be interspersed throughout the foraging area in small patches, with a majority, or sixty percent, of the area comprised of VSS 4, 5, and 6. *Id.* at 121.

In response to the agency's publication of its intent to prepare an impact statement, as well as the issuance some months later of a "Scoping Report" and supplemental materials, the Service received comments challenging the *MRNG's* conclusion that northern goshawks are habitat generalists. Draft EIS, 3 Rec. Ex. at 618, 621–22; *see* Letter from Duane L. Shroufe, Dir., Ariz. Game and Fish Dep't, to Larry Henson, Reg'l Forester, Forest Serv., 2 Rec. Ex. at 331–32 (Oct. 13, 1992) ("AGFD's *MRNG* Response"); Letter from Michael Spear, Reg'l Dir., Fish and Wildlife Serv., to Larry Henson, Reg'l Forester, Forest Serv., 2 Rec. Ex. at 315, 317–18 (Aug. 13, 1992) ("Spear Letter"). One agency in particular, the Arizona Game and Fish Department ("AGFD"), submitted a letter and a paper presenting scientific evidence refuting the Service's conclusion. AGFD's *MRNG* Response, 2 Rec. Ex. at 331–32; *see* AGFD's Review Paper, 2 Rec. Ex. at 231–33. The U.S. Department of the Interior's Fish and Wildlife Service ("FWS") also submitted similar comments in a letter dated August 13, 1992. Spear Letter, 2 Rec. Ex. at 315, 317–18 (citing eight scientific studies documenting the goshawk's preference for foraging in mature, close-canopied forests).

The Service responded directly to the two agencies' submissions, citing several

---

4. The Forest Service also incorporated guidelines for habitat management of the Mexican spotted owl into the instant final impact statement. As Appellants do not challenge the Service's actions with regards to the owl, discussion is limited to the northern goshawk.

5. The term "vegetation structural stages" is defined as "[a] generalized description of forest growth and aging stages based on the majority of trees in the specific diameter distribution of the stand." *MRNG*, 1 Rec. Ex. at 184.

scientific studies indicating that although goshawks prefer mature forest, the hawks occupy a wide range of forest types. *See* Letter from Richard T. Reynolds, Member, Scientific Comm. et. al., to Duane L. Shroufe, Dir., AGFD, 8 Rec. Ex. at 1904–07 (May 21, 1992) (stating that "no scientific evidence [finds] that goshawks are adapted, or are limited, to closed-canopied forests"); [6] Richard T. Reynolds, Member, Scientific Comm. et. al., to Noreen Clough, Acting Reg'l Dir., Region 2, FWS, 8 Rec. Ex. at 1908–09 (Sept. 15, 1992); *see also* Forest Serv., *Goshawk Opinion Paper: A Response to Arizona Game and Fish Department Review of U.S. Forest Service Strategy for Managing Northern Goshawk Habitat in the Southwestern United States,* 2 Rec. Ex. at 408–14 (1994) (relying on the ecology of each forest type present in the region, the goshawks' diet, and two scientific studies to support its conclusion that the goshawk is a habitat generalist). The Service also created an inter-agency team, the Goshawk Interagency Implementation Team ("GIIT"), to discuss implementation of the *MRNG's* recommendations, as well as identify concerns raised by and propose revisions to those recommendations. Opening Br. of Appellants Ctr. for Biological Diversity and the Sierra Club at 15; Service's Br. at 17; *Charter: Northern Goshawk Implementation Team,* 1 Rec. Ex. at 204–05.

In August 1994, the Service issued its draft version of the environmental impact statement, suggesting five alternative approaches to amending the region's forest plans. Draft EIS, 3 Rec. Ex. at 578, 586. Each alternative contained different ranges of VSS and canopy coverage. *See id.* at 587–88. Only three alternatives are relevant to this case. Alternative C proposed adoption of the *MRNG's* recommendations outright. *Id.* at 588. Alternative D was constructed after comments received by the GIIT on the *MRNG,* and advocated for higher old growth percentages than Alternative C. *Id.* Alternative F mirrored Alternative C, but recommended the implementation of an ecosystem demonstration project on the Apache National Forest. *Id.* The Draft EIS identified Alternative F as the Service's preferred alternative. *Id.* at 589.

The draft statement described each alternative's environmental consequences, Draft EIS, 3 Rec. Ex. at 592–616, and compared the standards and guidelines associated with each alternative. *Id.* at 668–79. The Draft EIS noted that the Committee's recommendations set forth in the *MRNG* were a part of all five alternatives. *Id.* at 597. As such, the alternatives were "not expected to have an (sic) significant adverse effect on goshawk population viability." *Id.* The Service further noted that the *MRNG* represented the best science available on the northern goshawk. *Id.*

The Draft EIS contained summaries of the comments received by the Service in response to the agency's publication of its intent to prepare an impact statement and issuance of a Scoping Report and supplemental scoping materials. *Id.* at 618–22. The comments section did not specifically mention or discuss the opposition expressed by the FWS's and the AGFD's submissions challenging the *MRNG's* conclusion that the goshawk is a habitat generalist. *Supra* p. 1161. The section did state that "[t]he [GIIT]'s suggestions have been incorporated in the environmental

---

**6.** The Record includes a letter from the Committee to the AGFD dated May 21, *1992.* 8 Rec. Ex. at 1904 (emphasis added). Appellees cite to this document as the letter responding to AGFD's *MRNG* Response, and note in their brief that the letter was mistakenly dated with the wrong year. Br. for Fed. Appellees at 13–14 & n. 4 ("Service's Br."). Appellants do not dispute the authenticity of this letter.

impact statement as Alternative D" in response to the team's request that their standards and guidelines be included as a separate alternative, Draft EIS, 3 Rec. Ex. at 621, and included a comment ("the summary comment") stating that "[a] few commenters expressed concern that the proposed standards and guidelines for the ... northern goshawk are grossly inadequate to protect the birds." *Id.* at 619. The Service responded that: "[t]he guidelines have been developed over several years using the best information and scientific review available. This amendment will incorporate the current information in each Forest Plan. The standards and guidelines in Forest Plans can easily be updated through future amendments." *Id.*

The Service again received and considered comments on the draft impact statement after its issuance. Final EIS, 4 Rec. Ex. at 998–99. Scientist D.C. Crocker–Bedford, in his individual capacity, the AGFD and the New Mexico Department of Game and Fish ("NMDGF") jointly, and Appellants submitted comments again challenging the Service's conclusion that the goshawk is a habitat generalist. Crocker–Bedford, a certified wildlife biologist employed by the Service and published researcher on the goshawk in Arizona, suggested that the Service should consider a moratorium on all harvesting within old-growth ponderosa pine forests throughout the Southwestern Region, because the scientific literature strongly intimates that goshawks prefer to forage in mature forests. *See* Letter from D.C. Crocker–Bedford to C.W. Cartwright, Jr., Reg'l Forester, Forest Serv., 4 Rec. Ex. at 772, 774–75, 779 (Nov. 27, 1994). In support of that argument, Crocker–Bedford referenced his own published research and numerous other scientific studies, several of which were released after the *MRNG* was published. *Id.* at 774–75, 791–831 (concluding that the northern goshawk preferred higher canopy stands for flight and prey capture and closed canopies for reducing competition and predation by open-forest raptors).

The AGFD's and the NMDGF's comment letter stated that "[t]he proposed old growth standard does not incorporate important habitat attributes or distribution requirements" to sustain the habitat needs of the northern goshawk. *See* Letter from Duane L. Shroufe, Dir., AGFD, and Jerry A. Maracchini, Dir., NMDGF, to Charles W. Cartwright Jr., Reg'l Forester, Forest Serv., *Comments on Draft Environmental Impact Statement (DEIS) for Proposed Amendments to 10 National Forest Land and Resource Management Plans (Plan Amendments) in the Southwestern Region,* 4 Rec. Ex. at 740–41, 743 (Nov. 30, 1994). The two state agencies also stressed that "[s]ome of the issues previously identified during the scoping process are being emphasized again in these comments because ... they were not adequately addressed or evaluated in the [Draft] EIS." *Id.* at 740. The AGFD's Review Paper arguing that the goshawk is a habitat specialist was attached to these comments. *Id.* at 760; *supra* p. 1161. The letter was accompanied by "management recommendations" calling for forty percent of the landscape in old forest or large old trees; a 6,000 acre management territory for known goshawk breeding areas, of which 5,400 acres would be devoted to foraging; management of mature and old growth forest outside goshawk postfledging areas and across the landscape; and a canopy cover of at least forty percent of VSS 4 through 6 in foraging areas. *Id.* at 762–63, 770.

Appellants' comments on the Draft EIS advocated for the inclusion of alternatives proposing a higher retention of old-growth forest and "alternative conservation strategies for the ... goshawk." Letter from Kieran Suckling, Southwest Ctr. for Biological Diversity, et. al., to Charles Cart-

wright, Reg'l Forester, Forest Serv., 3 Rec. Ex. at 699 (Dec. 1, 1994).[7] To support their argument that the northern goshawk is a foraging specialist, needing a habitat that provides mature, tall trees or old-growth stands, Appellants referenced numerous goshawk studies that were not discussed in the *MRNG*. *Id.* at 711–12. Several of the noted studies were released after the publication of the *MRNG*. *See id.*

In October 1995, the Service issued the final version of the environmental impact statement. Final EIS, 4–5 Rec. Ex. at 946–1212. The final statement, like the Draft EIS, discussed each proposed alternatives' environmental consequences. *Id.* at 960–89. The Service concluded that "little difference[s]" in the effect of the alternatives would result in the short term, while "major differences" would arise in the long term. *Id.* at 960. The Final EIS also compared the standards and guidelines associated with each alternative, 5 Rec. Ex. at 1089–1114, noting that the proposed standards and guidelines were developed over the years using the best information and scientific evidence available. 4 Rec. Ex. at 993.

Minor changes were made in the Final EIS to Alternatives C and D. *Id.* at 957–58. Alternative C was separated from Alternative F for purposes of clarity. *Id.* at 956. Alternative F, accordingly, advocated only for a demonstration project in the Apache National Forest. *Id.* at 958. Alternative D was revised to reflect verbatim comments submitted by the AGFD and the NMDGF, *id.* at 956, resulting in a "slight variation from the recommendations developed by the [GIIT] and from information depicted in the [*MRNG* ]." *Id.* at 958. The objective was to "sustain as much mature and old forest across the landscape as possible," 5 Rec. Ex. at 1093, with the

expectation that forty percent of the entire landscape would be old growth forest throughout time. *Id.* at 1092. To achieve that percentage of old growth forest, the alternative called for maintaining an average of twenty percent of VSS 5 and 6 characteristics across the landscape. *See id.* Alternative D further suggested, among other things, a minimum of forty percent canopy cover in foraging habitats. *See id.* at 1097.

One significant change was presented in the final statement; the Final EIS contained an additional alternative. 4 Rec. Ex. at 956. In reaction to comments arguing that the agency needed to respond to the Mexican Spotted Owl Recovery Plan, the Service included an additional alternative for consideration, Alternative G. *Id.* at 958. The standards and guidelines embodied in Alternative G were developed by the *MRNG*, recommendations from the GIIT, and comments presented by the AGFD and the NMDGF in response to the Draft EIS. 5 Rec. Ex. at 1103–04. Alternative G proposed that at least twenty percent of the landscape would be old growth, *see id.* at 1113; it also called for a mosaic of VSS across the forest landscape. *Id.* at 1109. The Forest Service recommended Alternative G as the preferred alternative. 4 Rec. Ex. at 959.

The Final EIS also contained a comments section, categorizing 418 comments on the Draft EIS into one of three groups. 4 Rec. Ex. at 999. Group One contained 300 letters expressing a preference for Alternative E. *Id.* Group Two contained ninety-eight letters discussing transportation issues. *Id.* Group Three contained twenty letters suggesting various changes to improve the final version of the environmental impact statement. *Id.* Although

---

**7.** Appellant Center for Biological Diversity was formerly known as the Southwest Center for Biological Diversity.

the Service responded to each group of comments, the Service did not mention or respond to comments challenging the agency's conclusion that goshawks are habitat generalists.

The Forest Service further included copies of certain comment letters received on the Draft EIS in Appendix F of the final statement. 5 Rec. Ex. at 1115–1201. The AGFD's and the NMDGF's joint comment letter dated November 30, 1994, *id.* at 1119–50; *supra* p. 1163–64, was included among other agency and local government submissions. The Service redacted a portion of the comment letter containing the AGFD's Review Paper from the Final EIS. *Id.* at 1139. The Service noted on the paper that "[t]his document was prepared by the [AGFD] in 1993. The Forest Service conducted an extensive review of that document in 1994. Both documents have been included in the planning record, but because of their extensive size are not reprinted in the F[inal] EIS." *Id.* Crocker–Bedford's and Appellants' comments were omitted from the appendix.

The Forest Service thereafter permitted interested parties to submit comments on the Final EIS. Forest Serv., U.S. Dep't of Agric., *Record of Decision for Amendment of Forest Plans: Arizona and New Mexico*, 6 Rec. Ex. at 1432, 1436 (1996) ("ROD"). In June 1996, the Regional Forester issued the ROD, in which the decision to implement Alternative G of the Final EIS was announced. *Id.* at 1439.

In the instant appeal, Appellants contend that the final impact statement fails to (1) include a reasoned analysis of the FWS's and the AGFD's opinion that northern goshawks are habitat specialists; (2) discuss and respond to at least seven scientific studies that cast doubt on the Service's conclusion that northern goshawks are habitat generalists; and (3) respond to comments filed by Appellants and Crocker–Bedford, identifying the scientific de-

bate whether northern goshawks are habitat generalists. Appellees respond that the final impact statement directly addresses and responds to the concerns identified above by including and analyzing Alternative D in the final statement, and by including the AGFD's Review Paper in the comments section of the final statement. Alternatively, by including the summary comment and the agency's response thereto in the comments section of the Draft EIS, the Service argues that it discussed and responded to the concern raised by the FWS and the AGFD in the draft statement. The agency's last contention, argued in the alternative, is that the planning record contains documents prepared by the Service which directly respond to the concern presented.

## II. STANDARD OF REVIEW

We review a district court's order granting summary judgment *de novo*. *Churchill County v. Norton*, 276 F.3d 1060, 1071 (9th Cir.2001) (citing *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir.1998)). We review an agency's compliance with NEPA under the Administrative Procedure Act, 5 U.S.C. § 706 (1994); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 375, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Churchill County*, 276 F.3d at 1071 (internal citation omitted), which provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions" that are "without observance of procedure required by law." 5 U.S.C. § 706(2)(D); *see also Cal. v. Block*, 690 F.2d 753, 761 (9th Cir.1982) (citing *Lathan v. Brinegar*, 506 F.2d 677, 693 (9th Cir. 1974) (en banc) (stating that the "without observance of procedure" standard applies when a party claims that an environmental impact statement fails to comply with the requirements of NEPA)).

■ We employ a "rule of reason [standard] to determine whether the [environmental impact statement] contains a 'reasonably thorough discussion of the significant aspects of the probable environmental consequences.'" *Kern v. United States Bureau of Land Mgmt.*, 284 F.3d 1062, 1071 (9th Cir.2002) (internal citation omitted). Under this standard, which is essentially applied in the same manner as the arbitrary and capricious standard, *see Neighbors of Cuddy Mountain v. United States Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir.1998) (citing *Marsh*, 490 U.S. at 377 n. 23, 109 S.Ct. 1851), review consists only of ensuring that the agency has taken a "hard look" at the environmental effects of the proposed action. *See Churchill County*, 276 F.3d at 1072 (citing *Or. Natural Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir.1997)).

■■ In interpreting NEPA, the Court gives substantial deference to the regulations issued by the Council on Environmental Quality ("CEQ"). *See* 42 U.S.C. § 4342; *Marsh*, 490 U.S. at 372, 109 S.Ct. 1851 (internal citations omitted). The procedures prescribed both in NEPA and the implementing regulations are to be strictly interpreted "to the fullest extent possible" in accord with the policies embodied in the Act. 42 U.S.C. § 4332(1); *Cal. v. Block*, 690 F.2d at 769. " '[G]rudging, *pro forma* compliance will not do.'" *Cal. v. Block*, 690 F.2d at 769 (quoting *Lathan*, 506 F.2d at 693).

### III. DISCUSSION

■ The controlling statute at issue here is NEPA, "our basic national charter for protection of the environment." *Blue Mountains Biodiversity Project*, 161 F.3d at 1215–16 (citing 40 C.F.R. § 1500.1(a)). The statute has two objectives. "First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec., Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) (internal citations omitted). NEPA does not contain substantive environmental standards and guidelines, *Kern v. Or. Natural Res. Council*, 284 F.3d at 1066, nor does the Act mandate "that agencies achieve particular substantive environmental results." *Marsh*, 490 U.S. at 371, 109 S.Ct. 1851. Instead, "it establishes 'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences." *Kern v. Or. Natural Res. Council*, 284 F.3d at 1066 (internal citations omitted). The Act also "prohibits uninformed—rather than unwise—agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). NEPA "emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision making to the end that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Churchill County*, 276 F.3d at 1072–73 (internal citations omitted).

NEPA requires agencies to:

include in every ... major Federal action[ ] significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, [and]

(iii) alternatives to the proposed action

. . .

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to . . . the public . . . and shall accompany the proposal through the existing agency review processes.

42 U.S.C. § 4332(2)(C). The detailed written document required is an environmental impact statement, which serves "as an action-forcing device to insure that [NEPA's] policies and goals" are considered during agency decision making. 40 C.F.R. § 1502.1.

The CEQ's regulations delineate the analysis that environmental impact statements must contain. Specifically, the agency "shall discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised." 40 C.F.R. § 1502.9(b). This disclosure requirement obligates the agency to make available to the public high quality information, including accurate scientific analysis, expert agency comments and public scrutiny, before decisions are made and actions are taken. 40 C.F.R. § 1500.1(b).

■ The parties do not dispute that the concerns raised by the FWS, the AGFD, Crocker–Bedford, and Appellants represent responsible opposing scientific viewpoints. It is further undisputed that those concerns identify scientific evidence and

opinions contradicting the Service's conclusion that northern goshawks are habitat generalists, and that the final impact statement's management recommendations rest upon the Service's habitat generalist conclusion. *See* Final EIS, 4 Rec. Ex. at 958; Draft EIS, 3 Rec. Ex. at 596–97 (stating that most of the management recommendations are a direct synopsis of the *MRNG* and that "[a]ll [proposed] alternatives are based on the [*MRNG's*] recommendations"); *see MRNG*, 1 Rec. Ex. at 95, 104 (concluding that the goshawk is a habitat generalist), 121 (recommending on the basis of that conclusion the interspersion of a mosaic of vegetation stages in small patches throughout the foraging area). Because the commenters' evidence and opinions directly challenge the scientific basis upon which the Final EIS rests and which is central to it, we hold that Appellees were required to disclose and respond to such viewpoints in the final impact statement itself. *See Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 704 (9th Cir. 1993) (finding that the Forest Service was required to address in the final environmental impact statement scientific criticisms opposing evidence upon which the final statement's management strategy rested); *Sierra Club v. Bosworth*, 199 F.Supp.2d 971, 981 (N.D.Cal.2002) (concluding that a reasoned discussion of major scientific objections must be disclosed in the final impact statement); 40 C.F.R. § 1502.9(b). The Service's failure to disclose and analyze these opposing viewpoints violates NEPA and 40 C.F.R. § 1502.9(b) of the implementing regulations. *Cal. v. Block*, 690 F.2d at 770–71 (stating that NEPA's requirement that responsible opposing viewpoints are included in the final impact statement "reflects the paramount Congressional desire to internalize opposing viewpoints into the decisionmaking process to ensure that an agency is cognizant of all the environmen-

tal trade-offs that are implicit in a decision") (citing *Andrus v. Sierra Club*, 442 U.S. 347, 350, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979); *Appalachian Mountain Club v. Brinegar*, 394 F.Supp. 105, 121 (D.N.H. 1975)).

■ By including and analyzing Alternative D in the final statement, Appellees argue that the final impact statement adequately addresses and responds to the concerns identified above. Appellees rely on 40 C.F.R. § 1503.4(a)(1) as evidence of the agency's compliance with NEPA's regulations.[8] Appellees' reliance on subsection 1503.4(a)(1), however, is misplaced. While subsection 1503.4(a)(1) permits the agency to modify alternatives included and analyzed in the final statement as a response to comments filed with the agency, that subsection does not eliminate the agency's obligation to disclose and discuss responsible opposing viewpoints set forth in subsection 1502.9(b). To hold otherwise would render subsection 1502.9(b) superfluous. The agency here has not satisfied its regulatory obligations simply by including Alternative D into the final statement. The applicable regulations require the Service to disclose and discuss the responsible opposing views in the final impact statement. Because the agency did not make such a disclosure, the final statement violates NEPA and its implementing regulations.

■ Appellees' contention that inclusion of the AGFD's Review Paper in the comments section of the final statement satisfies NEPA's disclosure requirement also lacks merit. Because the agency redacted from the final statement the entire paper, which contained the AGFD's concern challenging the *MRNG's* conclusion that goshawks are habitat generalists, the final statement fails to disclose and discuss the responsible opposing viewpoint presented in accordance with NEPA and the implementing regulations.

■ The Service also claims that the concern raised by the FWS and the AGFD was discussed in the Draft EIS, directing the Court to the summary comment and the agency's response provided in the text of the draft statement. Draft EIS, 3 Rec. Ex. at 619; *supra* p. 1162. That comment, however, fails to identify and discuss the concern at issue here. The summary comment does not mention or even allude to the habitat specialist/generalist debate. Instead, it generally states that there are opposing views to the agency's proposed standards and guidelines. The comment also neglects to specifically point out which standards and guidelines are opposed. *See Cal. v. Block*, 690 F.2d at 773 (finding that in tabulating comments, charting the comments' preferences for wilderness, nonwilderness, or further planning, and incorporating these lists into the agency's proposed action, the Service failed to reveal the substance of the comments beyond bald designation preferences). Furthermore, the response completely fails to address or refute the concern presented. The Service's response indicates that the management recommendations derive from the best science available, but it fails to indicate how that evidence supports its conclusion that goshawks are habitat generalists. Under such circumstances, the Court cannot find the agency's inclusion of the summary comment adequate to meet the disclosure requirements of NEPA and its implementing regulations.

■ The agency's last contention points to evidence prepared by the Forest

---

**8.** Title 40 C.F.R. § 1503.4(a) states that "[a]n agency preparing a final environmental impact statement shall assess and consider comments both individually and collectively, and shall respond by one or more of the means listed below.... Possible responses are to ... [m]odify alternatives including the proposed action." 40 C.F.R. § 1503.4(a).

Service in the planning record to demonstrate that the agency directly responded to the concern presented. The record contains comments submitted by the FWS and the AGFD in response to the Service's notice of intent to prepare an environmental impact statement and the *MRNG*. It also contains the Service's responses to those two agencies, as well as intra-office memoranda prepared by the agency after the issuance of the Final EIS. The memoranda purportedly discuss the seven scientific studies in question here and respond to the comments submitted by Appellants and Crocker–Bedford. The Service's argument, however, ignores NEPA's specific disclosure requirements. While the agency is not required to publish each individual comment in the final statement, *Cal. v. Block*, 690 F.2d at 773 (internal citation omitted); 40 C.F.R. § 1503.4(a), the regulations clearly state that the agency must disclose responsible opposing scientific opinion and indicate its response in the text of the final statement itself. 40 C.F.R. § 1502.9(b). The mere presence of the information in the record alone does not cure the deficiency here. *See False Pass v. Watt*, 565 F.Supp. 1123, 1141 (D.Alaska 1983) (holding that neither the administrative record outside of the environmental impact statement itself nor any other evidence may be used to remedy deficiencies in the environmental impact statement) (citing *Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068, 1074 (1st Cir. 1980)), *aff'd sub nom. False Pass v. Clark*, 733 F.2d 605 (9th Cir.1984).

Accordingly, we find that the Final EIS fails to disclose and discuss responsible opposing scientific viewpoints in the final statement itself in violation of NEPA and the implementing regulations. We there-fore reverse the district court's grant of summary judgment and remand to the district court with directions that it remand the final statement to the Forest Service for further proceedings consistent with this opinion. *See Vitarelli v. Seaton*, 359 U.S. 535, 545, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959) (standing for the well-established principle that an agency is generally required to follow its regulations); *see also Cal. v. Block*, 690 F.2d at 769 ("Agencies are ... obliged to adhere to the procedures mandated by NEPA.") (*citing Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 549 n. 21, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)).[9]

**REVERSED AND REMANDED.**

---

9. Appellants also contend that the Service failed to consider a reasonable range of alternatives in the final impact statement. The Court does not reach this issue. Instead, we defer to the agency to decide in the first instance what range of alternatives to consider and respond to in light of the differing scientific opinions.